**Gina Gail CELAYA, Petitioner,**

v.

**Terry STEWART, et al., Respondents.**

**No. CV 01–622–TUC–DCB.**

United States District Court,
D. Arizona.

Feb. 25, 2010.

Walter B. Nash, III, William James Kirchner, Nash & Kirchner PC, Tucson, AZ, for Petitioner.

### ORDER

DAVID C. BURY, District Judge.

The Court dismisses grounds two and three, and grants habeas relief on ground one of the Second Amended Petition. Respondents shall release Petitioner from custody unless, within days, retrial proceedings are commenced.

## BACKGROUND

During the late night hours of December 21, 1992, Petitioner Celaya shot Trinidad Lopez, age 51. He died. She was years old and claimed she shot him in self-defense. She was transferred to adult court. A jury tried and convicted her of first degree murder and armed robbery. She was sentenced to a term of years to life on the murder charge and a consecutive term of 10.5 years for armed robbery. On direct appeal, the consecutive sentence was reversed, and she was resentenced to a concurrent term of prison for the armed robbery offense.

On November 28, 2001, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody, pursuant to Title 28, U.S.C. § 2254. This Petition was held in abeyance while she exhausted unexhausted claims, and she subsequently filed a First Amended Petition on January 30, 2002, and a Second Amended Petition on September 26, 2007. Respondents filed an Answer on March 3, 2008. Petitioner filed a Reply on June 16, 2008.

On August 4, 2008, the Petition was referred to Magistrate Judge Bernardo P. Velasco for a Report and Recommendation (R & R) in accordance with 28 U.S.C. § 636(b)(1) and LRCiv. 72, Rules of Practice of the United States District Court for the District of Arizona.

On August 27, 2009, Judge Velasco issued the R & R. He recommends that this Court find the Petition is not barred by the one-year statute of limitations under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and that this Court grant ground one of the Petition and dismiss grounds two and three. Both parties filed written objections to the R & R, pursuant to 28 U.S.C. § 636(b) and Fed. R. Civ.P.72(b). The matter is ready for final disposition by this Court.

## STANDARD OF REVIEW

The duties of the district court in connection with a R & R by a Magistrate Judge are set forth in Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636(b)(1). The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Fed.R.Civ.P. 72(b), 28 U.S.C. § 636(b)(1). Where the parties object to a R & R, a district court judge "shall make a de novo determination of those portions of the [R & R] to which objection is made." 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140, 149–50, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). When no objections are filed, the district court need not review the R & R *de novo. Wang v. Masaitis,* 416 F.3d 992, 1000 n. 13 (9th Cir.2005); *United States v. Reyna–Tapia,* 328 F.3d 1114, 1121–22 (9th Cir.2003) (en banc).

This Court's ruling is a *de novo* determination as to those portions of the R & R to which there are objections. 28 U.S.C. § 636(b)(1)(C). To the extent that no objection has been made, arguments to the contrary have been waived. *See* 28 U.S.C. § 636(b)(1)(A) (objections are waived if they are not filed within ten days of service of the R & R), *see also McCall v. Andrus,* 628 F.2d 1185, 1187 (9th Cir.1980) (failure to object to magistrate's report waives right to do so on appeal); Advisory Committee Notes to Fed.R.Civ.P. 72 (citing *Campbell v. United States Dist. Court,* 501 F.2d 196, 206 (9th Cir.1974) (when no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation)).

## STATUTE OF LIMITATIONS

A one-year limitation period applies to petitions for a writ of habeas corpus by a person in custody pursuant to a judgment of a state court. 28 U.S.C. § 2244(d).

Under the AEDPA, a state prisoner must file the petition within one year from "the date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review[.]" 28 U.S.C. § 2244(d)(1)(A). "The time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation[.]" 28 U.S.C. § 2244(d)(2).

■■■ The Court looks to the rules of the state court to determine when a state decision on a post-conviction petition is final to determine whether the petition is still pending for purposes of tolling the statute of limitations under § 2244(d). (R & R at 1072–73.) In Arizona, a claim for post-conviction relief has been exhausted if it is presented to the court of appeals. *Id.* at 1067 (citations omitted). A discretionary petition to the Arizona Supreme Court is unnecessary. *Id.*

Here, it is undisputed that direct review by the state courts of Petitioner's criminal conviction was concluded when the Arizona Supreme Court denied review on September 18, 1996. The time for seeking review was 90 days. The Petitioner's conviction became final on December 17, 1996. She filed her notice of post-conviction relief on October 7, 1996, and the petition on August 3, 1998. The one-year statute of limitations was tolled while the petition for post-conviction relief was pending in the state courts.

■■ This is the question before the Court. Respondent argues that the petition for post-conviction relief was no longer pending as of October 17, 2000, when the Arizona Court of Appeals issued the decision denying the petition for post-conviction relief. The Petitioner argues that for the purpose of tolling the statute of limitation period for habeas relief, 28 U.S.C. 2244(d)(2), the state petition was pending until the mandate issued on November 30, 2000.

Since *Hemmerle v. Schriro*, 495 F.3d 1069, 1073–74 (9th Cir.2007), the answer for tolling the habeas statute of limitations has been that a state petition for post-conviction relief becomes final *when appellate review is denied* because then there is nothing for the state courts to do and, therefore, nothing remains pending. *Id.* at 1077. As Magistrate Judge Velasco noted, *Hemmerle* is factually distinct from the procedural posture of this case. The court in *Hemmerle* considered the finality of a post-conviction petition where Hemmerle sought review from the Arizona Supreme Court after the state court of appeals denied him review, after the trial court denied him relief. The court concluded that once the state supreme court decides to deny review, the appellate decision is final.

Here, the court of appeals *granted review and denied the petition*. Celaya did not seek review of the court of appeal's decision. Under such circumstances, the Arizona Rules of Criminal Procedure governing appeals and other post-conviction relief, Rule 31.23, provides: "if there has been no motion for reconsideration and no petition for review filed, the clerk of the Court of Appeals *shall issue the mandate* at the expiration of the time for the filing of such motion or petition." Motions for reconsideration must be filed within 15 days after the filing of a decision by the appellate court. Rule 31.18. A petition for review is filed within 30 days after the filing of a decision or within 15 days after the clerk has mailed a notice of the determination of a motion for reconsideration. Rule 31.19. Because the appellate court issued a decision denying relief and petitioner did not seek review, the appellate court issued the mandate 30 days after it had issued the decision. Under Arizona

law, this concluded appellate review. (R & R at 1074–75) (citations omitted).

*Hemmerle* is inapplicable because there was no petition for review and no denial of review by any reviewing court. As Respondent notes, under the Arizona rules, there is no requirement for a mandate to issue from a denial of review. Under such circumstances, review is final when denied. There is nothing more for the reviewing court to do.

Here, the appellate court granted review and issued a decision, which became final when it issued the mandate as required by Rule 31.23. Here, once the appellate court issued its decision, it still needed to issue the mandate.

Speaking in respect to the one-year statute of limitations applicable to federal petitions for habeas relief pursuant to 28 U.S.C. § 2255, the Supreme Court of the United States wrote: "Finality has a long-recognized, clear meaning in the post-conviction relief context: Finality attaches in that setting when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States,* 537 U.S. 522, 527, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003). The Court explained that while Congress had left the term undefined in the federal habeas statute, presuming of course that the term would be defined in conformity with Court precedent, *id.,* it had defined the term in 28 U.S.C. § 2244(d)(1), the parallel statutory provision for state habeas petitions. Both define when a direct appeal becomes final as: the date the judgment becomes final by conclusion of direct review or expiration of the time for seeking such review, *id.* at 530–32, 123 S.Ct. 1072. For a criminal defendant who does not file a petition for *certiorari* to the Supreme Court, the one-year limitation period starts to run when the time for seeking such review expires.

*Id.* at 532, 123 S.Ct. 1072. *See also, Wixom,* 264 F.3d 894, 897 (9th Cir.2001) (describing finality the same for purposes of determining when a direct appeal is final under 28 U.S.C. § 2244(d)(1)(A)).

For tolling purposes, however, state law determines finality. *See Bunney v. Mitchell,* 249 F.3d 1188, 1189 (9th Cir. 2001) (certifying the question to the California Supreme Court: "when is the summary denial of a petition for habeas corpus by the California Supreme Court final.") In *Hemmerle,* the court answered the question of when a decision to deny review is final under Arizona law analogously to the federal definition that finality for tolling purposes under 2244(d)(2) is when review is denied. But, *Hemmerle* did not address the question of when a decision denying a post-conviction petition by the court of appeals is final where there is no request for review. This Court agrees with Magistrate Judge Velasco's answer: a decision of the Arizona Court of Appeals is final upon the issuance of the mandate.

In 1998, the Arizona Court of Appeals considered the question of when the statute of limitation period begins to run on a legal malpractice claim. *Thompson v. Holder,* 192 Ariz. 348, 965 P.2d 82 (Ariz. App.1998). The court held the claim accrues when the appellate process in the underlying litigation is completed or is waived by a failure to appeal. *Id.* Specifically, the court held the appellate process is completed when the court of appeals issues its mandate. *Id.* Relying on *Amfac Distribution Corp, v. Miller,* 138 Ariz. 155, 673 P.2d 795, 796–98 (1983), the court wrote:

[B]oth this court and the supreme court have pegged the date of accrual to the termination of the appellate process; the issuance of the mandate both accomplishes and formally signifies that termi-

nation. Third, the law might minutely accelerate finality by pegging accrual to the earlier date, but at the cost of setting a trap for the unwary-a trap perfectly illustrated by this case. As the law does not favor statutes of limitations, we decline to achieve so scant a gain-here a matter of four days-at so high a cost. And finally, the issuance of the mandate provides a "bright-line" event to count from; and in counting time, a bright-line rule serves all.

*Id.* at 351, 965 P.2d 82.

The Arizona Rules require a mandate to finalize a decision issued by the court of appeals. Rule 31.23. The Court agrees with the Magistrate Judge that under Arizona law, the Petitioner is entitled to statutory tolling because an Arizona appellate court decision is not final until the mandate issues. Additionally, the Court agrees with the Magistrate Judge that counsel in this case did not miscalculate the deadline, but relied in good faith on existing legal precedent, which in 2001, when he filed the federal Petition, conclusively established that a petition for post-conviction relief is pending in the Arizona courts until the date a reviewing court issues a decision and its mandate. (R & R at 1075–76) (citations omitted); *see also Thompson,* 965 P.2d at 85.

## GROUND ONE: EXCLUSION OF DEFENSE WITNESSES

 The Government's theory of the case was that Gina Celaya posed as a prostitute to convince the victim to pick her up, intending to steal his money and car-jack his truck. She drove out to the desert with him, possibly forcing him at gun-point to drive to the desert, where she shot him, and stole his money and truck.

The defendant took the witness stand and said she was walking down South Sixth Avenue, when the victim stopped and offered her a ride, which she accepted because it was late at night. He did not take her home, but instead drove to a wildcat dump in the desert, where he asserted she was a prostitute and when he found out otherwise, he nevertheless insisted on culminating a sex act. He frightened her, put her in fear of serious physical injury and fear for her life. She shot him in self-defense.

Petitioner offered three defense witnesses. They would have testified "that on two prior occasions the victim drove women he picked up as prostitutes to an isolated desert location where he forcibly sexually attacked them, and that he had a reputation for violence among prostitutes." (R & R at 1080.) This would have corroborated her account, including: "1) that the victim voluntarily offered her a ride; 2) that through his own initiative, he drove to the isolated desert setting where he was found; 3) that he did so with the intent to engage in sexual relations with her; and 4) that he was sexually assaultive and abusive with her when they arrived." *Id.*

Relevant to the Petition, the trial court precluded as defense witnesses two prostitutes and a bartender. The court held that "'where self-defense is asserted, as here, then the defendant charged with homicide may be permitted to introduce evidence of specific acts of violence by a deceased *only* when those acts were personally observed by the defendant or made known to him (her) prior to the homicide.'" (R & R at 1077–78) (citations omitted). The court also held the witnesses' testimony was not relevant because it was based on the unreliable recollections of a drug addict and was too speculative to meet the threshold for admissibility to a jury. *Id.*

 As noted by Magistrate Judge Velasco, "[a] state trial court's admission of evidence under state evidentiary law will form the basis for federal habeas relief

only where the evidentiary ruling 'so fatally infected the proceedings as to render them fundamentally unfair' in violation of the petitioner's due process rights." (R & R at 1078 (citing *Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir.1991)) (emphasis added)). The Court agrees with the Magistrate Judge that this is such a case because the trial court's evidentiary rulings prevented the Petitioner from meaningfully presenting a complete defense. *Id.* at 1079 (citing *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), *Washington v. Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)).

■ In making her decision, the state trial court relied on Rule 404(a) and 405(b). Character evidence is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except if it is offered by an accused in a homicide case to show that the alleged victim was the first aggressor. Rule 404(a)(2). Character evidence may only be offered by specific instances of conduct in a case in which character or a trait of character of a person is an essential element of a charge, claim, or defense. Rule 405(b). The violent or aggressive character of the victim is neither an element of

the homicide offense nor self-defense, except for a claim of self-defense where the defendant personally observed the victim's violent character or it was made known to him prior to the homicide. *State v. Jackson,* 94 Ariz. 117, 121, 382 P.2d 229 (1963). Then the evidence is admitted because it has a bearing on the defendant's state of mind and the reasonableness of his belief that deadly force was necessary when it was used. *State v. Williams,* 141 Ariz. 127, 685 P.2d 764, 767 (Ariz.App.1984) (citations omitted).[1] Because the defendant admittedly did not know of the alleged violent or aggressive character of the victim, the trial court precluded the defense witnesses under Rule 404(a) and 405(b).

■ The trial court ignored admissibility under Rule 404(a)(2), where the character of the victim may be offered by the accused as evidence that the victim was the first aggressor, but only by proof as to reputation or opinion, under Rule 405(a). At a minimum, the witnesses should have been allowed to testify as to their opinions and the victim's reputation for violence. Arizona Rule 404(a) is the same as Rule 404(a) of the Federal Rules of Evidence. The Advisory Committee's Notes to the federal rule explain the "mercy rule"[2] "is so deeply imbedded in our jurisprudence as to assume almost constitutional proportions and to override doubts of the basic

---

**1.** "Nothing in the self-defense statute refers to the person's subjective beliefs or knowledge about the aggressor's history: the relevant inquiry is whether, under the circumstances during the event in question, an objectively reasonable person would believe it necessary to physically defend herself." (R's Objection to R & R (R Object) at 25.)

**2.** The so-called "mercy rule" permits a criminal defendant to introduce evidence of pertinent character traits of the victim because the accused, whose liberty is at stake, may need "a counterweight against the strong investigative and prosecutorial resources of the gov-

ernment." *Belardo v. Virgin Islands,* 2009 WL 1106937, *6 (D.Virgin Islands 2009) (citing Rule 404 advisory committee note) (citing C. Mueller & L. Kirkpatrick, Evidence: Practice Under the Rules, pp. 264–5 (2d ed. 1999)); *see also* Richard Uviller, Evidence of Character to Prove Conduct: Illusion, Illogic, and Injustice in the Courtroom, 130 U. Pa. L. Rev. 845, 855 (1982) (the rule prohibiting circumstantial use of character evidence "was relaxed to allow the criminal defendant with so much at stake and so little available in the way of conventional proof to have special dispensation to tell the factfinder just what sort of person he really is").

relevancy of the evidence." Fed.R.Evid. 404, Advisory Committee Note: 1972 Proposed Rules, Note to Subdivision (a).

While Respondent's Objection discusses whether the evidence in question meets the definition of *modus operandi*, (R's Objection at 25–28), it was never argued that the precluded testimony should have been admitted under Rule 406, which allows evidence of the habit of a person relevant to prove that the conduct of the person on a particular occasion was in conformity with the habit or routine practice. The Magistrate Judge did not consider admissibility of the witnesses' testimony to show *modus operandi*, "i.e., the victim's habit—of taking women to secluded parts of the desert and raping them," (Respondent's (R's) Objection at 25); the Magistrate Judge only noted that the evidence was inartfully referred to as the victim's modus operandi, (R & R at 1081).

The Magistrate Judge found, "[t]he state courts erred by failing to fully consider the admission of specific act evidence under Rule 404(b) (the testimony of Ms. Larrivas and Ms. Carranza) for the purpose of corroborating Petitioner's version of events, and to show the victim's motive and intent to sexually assault Petitioner in order to ensure a fundamentally fair trial." (R & R at 1081.) The prejudice to the defendant was further compounded because the State opened the door to such evidence when it attacked the defendant's credibility and argued the victim was a family man who was not intending to sexually assault the defendant, but was merely being "grandfatherly," i.e., a nice guy and giving her a ride home. *Id.*

The Petitioner challenges the trial court's preclusion as defense witnesses of two prostitutes, who both recognized the victim from his photograph on the news. The trial court also excluded the testimony of a bartender, who came forward during the trial when she recognized the victim's picture in the news.

The Court precluded witness Larrivas' testimony because there was no evidence to show that the defendant knew of the victim's violent character, (R's Objection to R & R, Ex. 10, Minute Entry; Ex. 7 Motions Hearing, 6/10/1994: TR at 3 (describing Larrivas' statement as very definite on ID and date and truck)), and precluded witness Carranza's testimony as too speculative to reach the threshold for admitting it to the jury, *id.*, Ex. 7: TR at 2–3 (disallowing Carranza testimony as too speculative to reach the jury; it would only confuse the jury and invite speculation, prejudicial effect would outweigh any probative value); TR at 8 (refusing to bootstrap with Larrivas' definitive testimony the speculative testimony of Carranza), *see also* TR at 3 (describing Tracy Stewart interview as consisting of astonishingly leading questions); TR 8–9 (disallowing statement by Tracy Stewart as falling somewhere between Larrivas and Carranza in regard to its speculative nature). During the trial, when the bartender came forward, the trial court found her testimony as wholly speculative because she identified the victim as a customer of a bar other than the Hideout, which was the bar frequented by the victim, and described him as being in the bar during a time previous to when he moved to Tucson, and she had not seen him since six to seven years before the murder. *Id.* at 23.

While Ms. Carranza was easily confused on details of her life, she like Ms. Larrivas testified with specificity and detail regarding her recall of the victim and how he had abused and scared her. (R's Objection to R & R, Ex. 1: Carranza Depo. 1/7/1993) (i.e., at TR 9 (admitting her memory was bad, but the reason she remembered him was because he scared her so bad)). The witnesses' testimony matched, generally,

the victim regarding such things as age, weight, build, where he worked, mannerisms such as always wearing a baseball cap, and that he drove a small light-colored truck with a camper shell. The witnesses' stories also matched several of the details claimed by the defendant, such as the victim initiating the pick-up and taking the women to the wildcat dump in the desert for sex and sexually assaulting them. This corroborative evidence was especially important because the state impeached the defendant by arguing she did not tell her friends of the sexual assault and accused her of making it up in response to Detective Thomson's interrogation after he suggested that if she shot the victim in self-defense she should say so and stop denying the shooting.

As the Magistrate Judge noted, the precluded witnesses' testimony was not presented in a vacuum. Not at issue in this habeas petition, three other witnesses had provided similar stories, bolstering the relevance and reliability of the two prostitutes and the bartender's testimony. (R & R at 1081–82) (discussing the Garcia sisters' testimony about the victim's abusive acts toward women at the Hideout bar and testimony from another prostitute, Terry Stewart, that was similar to the testimony of Carranza and Larrivas).

■ Nevertheless, the court was persuaded that Ms. Carranza and the bartender's testimony was too speculative and unreliable to be presented to the jury. Respondent continues to argue that the witnesses were unreliable because they were drug addicts and prostitutes, with clouded memories, and it was uncertain that they were talking about the same man as the victim. The Court finds the picture painted by Respondent about these witnesses' credibility is exaggerated and misleading. (P's Response to R's Objection at 14–17.) The credibility of a witness' testimony is for a jury to decide, not a judge.

*United States v. Smith,* 538 F.2d 1359, 1363 (9th Cir.1976), *State v. Roberts,* 139 Ariz. 117, 677 P.2d 280, 284 (Ariz.App. 1983). Credibility raises questions of whether a witness' testimony does in fact accurately reflect what took place as opposed to perception and memory in general. *Roberts,* 677 P.2d at 284. The latter determination is made by a trial court as a threshold assessment for admissibility of evidence depending on a witness' ability to observe, recollect and communicate the subject of the testimony. *Id.*

Here, the trial court found the evidence inadmissible under Rule 404(a), 405(b) and because it was too speculative. She never discussed admissibility of the defense witnesses' testimony under Rule 404(b), and the state appellate court only briefly considered Petitioner's Rule 404(b) arguments. (R & R at 1080–81.)

Rule 404(b) allows specific instances of other crimes, wrongs, or acts by the victim to be admitted as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The defendant offered the testimony to rebut the state's charge that she pretended to be a prostitute to pick up the victim, intending to rob and murder him and carjack his truck, and to show instead that the victim voluntarily offered her a ride, intending to solicit or force her to have sexual relations with him, drove on his own initiative to the isolated desert area and was sexually assaultive and abusive, which caused her to fear for her life and shoot him in self-defense.

■ Under Rule 404(b), a court decides admissibility based on four factors: 1) there must be proof of the prior bad act based on sufficient evidence; 2) the crimes or acts must not be too remote in time; 3) the prior conduct must be similar to the acts defendant is charged with, and 4) the evidence must prove an essential element

of the offense. *Huddleston v. United States,* 485 U.S. 681, 690, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); *United States v. Houser,* 929 F.2d 1369, 1373 (9th Cir.1990); *State v. Gulbrandson,* 184 Ariz. 46, 906 P.2d 579, 593 (1995). In *Huddleston,* the Court explained that the trial court makes a preliminary finding that the government has proved the "other act" by a preponderance of the evidence before it submits the evidence to the jury. *Huddleston,* 485 U.S. at 682, 108 S.Ct. 1496.

█ In Arizona, a prior bad act must be proved by clear and convincing evidence before it may be admitted against the defendant in a criminal case, *State v. Terrazas,* 189 Ariz. 580, 944 P.2d 1194, 1198 (1997) (en banc). This heightened standard is applied to protect the defendant's interest in a fair trial because evidence of a defendant's prior bad act is generally more prejudicial than probative and "can easily tip the balance against the defendant." *Id.* (citing *Uncharged Misconduct Evidence,* 1–SUM Cri. Just. 6,8 (1986)). In this case, the clear and convincing standard was contrary to the defendant's interest in a fair trial.

As the Magistrate Judge properly noted, the trial court's evidentiary mistake in precluding the defense witnesses, either to present opinion or reputation character evidence or prior bad acts evidence, will ONLY form the basis for habeas relief if it so fatally infected the proceedings as to render them fundamentally unfair in violation of the Petitioner's due process rights. By excluding these witnesses, all that remained before the jury was her testimony which was countered by testimony from her friends that she said she shot the guy and stole his truck, she had a gun and she was joy-riding in the victim's truck, and on cross examination, her admission that she never told anyone, including her friends, about being sexually assaulted or having to shoot the victim in self-defense until after

her arrest when Detective Thomson suggested it would be in her best interest to stop denying the shooting if she had shot the victim in self-defense. The trial court admitted into evidence the victim's good character and the defendant's prior bad acts.

The Court agrees with the Magistrate Judge:

> Without the testimony of the three witnesses, there was very little reason for the jury to believe Petitioner's version of events. The testimony of those witnesses would have drastically altered the jury's perception of what happened the night Mr. Lopez was shot. There is no question that Petitioner admitted she shot the victim and took his truck. If Petitioner had presented testimony that corroborated her version of events, there is a strong chance the jury may have chosen to believe that while what happened before and after the events which occurred in the desert may have been an exercise in extremely poor judgment as well as a complete disregard for human life by Petitioner, that Petitioner's friends were lying, or Petitioner was lying when she told her friends how she obtained the truck.

(R & R at 1084.)

The evidence precluded by the trial court was relevant and vital to the defense. Under Rule 403, relevant evidence may be precluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. These were minor interests compared to the importance of the precluded defense witnesses. The Court agrees that the preclusion of these witnesses had a substantial and injurious effect on the verdict in Petitioner's case. (R & R at 1082–83.)

The Court grants relief on ground one of the Petition. This ruling is on all fours with the recent Arizona appellate case *State of Arizona v. Fish*, 222 Ariz. 109, 213 P.3d 258 (Ariz.App.2009), where the court noted that most cases addressing Rule 404(b) admissibility go to show motive, opportunity, intent, and preparation on the part of the defendant, but held that the rule also applies to prior acts of alleged victims and third parties. *Id.* at 271. In *Fish*, the defendant was convicted of second degree murder for shooting and killing a man. Defendant testified that when he encountered the victim while on a nature walk, the victim's dogs attacked him. He shot into the ground in front of the charging dogs and scared them away. Then, the victim charged him screaming and yelling, looking crazy and enraged. *Id.* at 262. When the victim would not stop, even after the defendant pointed a gun at him and yelled for him to get back and stop, the defendant shot and killed him. *Id.* The defendant argued he acted in self-defense. There were no other witnesses to the incident.

The trial court allowed character witnesses to testify as to their opinions of the victim's and the dogs' propensities for aggression and violence, but would not allow any evidence of specific prior acts of aggression and violence in respect to the victim's relationships with dogs. The appellate court held that the trial court properly precluded specific act evidence under Rule 404(a)(2), but may have erred in precluding the evidence under Rule 404(b)(2). *Id.* at 263. The appellate court explained that the evidence was not offered to show the victim's character to prove disposition or propensity to acts of a particular type, and therefore it could be admitted under Rule 404(b) to show the victim's motive or intent or to corroborate the Defendant's version of events. *Id.* at 272. The court found that if offered to show the victim's state of mind, the evidence would necessarily relate to the defendant's state of mind, and would be inadmissible unless the defendant knew of the prior specific conduct. *Id.* "However, just as the superior court concluded the general reputation evidence about Victim's propensity to violence was relevant to corroborate the Defendant's description of what he faced just prior to the shooting, the specific act evidence was similarly relevant to rebut the State's argument that Defendant fabricated or exaggerated the Victim's acts on the date of the shooting." *Id.* at 273.

Importantly, the court held the probative value of the specific act evidence for purposes of Rule 403 balancing would have been the enhancement of the defendant's testimony about self-defense because it bolstered his credibility and rebutted the state's argument that the defendant's story was fabricated. *Id.* Just as this Court noted in this case, the other acts evidence involved specific acts that were very similar to the facts described by the defendant in his plea of self-defense. The court found the trial court's balancing under Rule 403 was skewed because it assumed the specific act evidence was not even relevant and summarily concluded that it would have little probative value even though the key issue of self-defense turned upon the credibility of defendant's description of the event because he was the only living human witness to the shooting. The trial court erred in weighing a low probative value when the evidence was highly probative as to the accuracy and veracity of defendant's statement. *Id.* at 274. The risk of the jury using the evidence for an improper purpose is minimized by a limiting instruction. *Id.* at 274.

In contrast, the character evidence related to the victim was highly sanitized with none of it reflecting how aggressive or violent the victim had become when he was confronted about being at a location

with his dogs. The court found the error was not harmless and remanded the case for retrial with a directive to the trial court that it consider admissibility of the evidence under 404(b) using the balancing factors set out in the opinion. *Id.* In Petitioner Celaya's case, the trial court did not even allow a sanitized version, under Rule 404(a)(2), of opinion or reputation evidence regarding the victim's violent character. In this case, just as in *Fish*, the trial court erred in not admitting evidence of the victim's specific prior acts of violence and aggression. In this case, the error deprived the Petitioner of her constitutional due process rights to present a complete defense and a fair trial. Petitioner prevails on ground one of the Petition.

### GROUND TWO AND THREE

▇ Petitioner argues that the trial court erred by refusing to admit Petitioner's tape-recorded statement in its entirety after the State used portions of it to impeach her. The Petitioner argues that the defense should have been allowed to admit the tape recording under the Rule of Completion, Ariz. R. Evid. R. 106.

The tape recording at issue in the Petition was her interrogation by Tucson Police Detective Thomson, when she initially denied the shooting but after the detective asked her whether the man had tried to harm her and told her this was her chance to say so, she made the self-defense claim. The state sought and was granted preclusion of the taped statements as self-serving hearsay. After the defendant took the stand and testified that she shot the victim in self-defense, the state used excerpts of the tape to impeach her. In an effort to rehabilitate the defendant on redirect, the defense attorney sought, but was denied, admission of the entire tape recording to show the context of the excerpts used by the state for impeachment. The trial court denied admission, without explanation, of the first 10–24 pages of the tape and ruled that the second portion of the tape would not be admitted because the witness had been adequately rehabilitated. The appellate court affirmed the trial court because Rule 106 applies only when proof is made through introduction of a statement, not through impeachment. On impeachment, the risk of misleading the jury is avoided by the witness explaining misperceptions and inconsistencies on redirect, rather than with past hearsay. (R & R at 1084–87.)

As he did in respect to Petitioner's claims of error related to the preclusion of the defense witnesses, the Magistrate Judge noted that the rule of completeness was a question of Arizona evidence law. The Magistrate Judge only considered whether the evidentiary ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

The Petitioner cannot cobble together "clearly established"[3] Supreme Court precedent from *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), the common-law rule of completeness, and general principles of due process. (P's Objection to R & R at 5) (citations omitted). Like the Magistrate Judge, this Court looked and found no clearly established Supreme Court precedent addressing the constitutionality of the Rule of Completeness or extending the protections of the Due Process Clause, the Compulsory Process Clause or the Confrontation clause to a trial court's exclusion of a defendant's otherwise inadmis-

---

**3.** *See* (R & R at 1069–71) (discussing the threshold question under the AEDPA as to whether a petitioner seeks to apply a rule of law that was clearly establish at the time his state-court conviction became final.)

sible statement to rehabilitate a defendant after impeachment. (R & R at 1087–88.) This Court also agrees with the Magistrate Judge that, if there was constitutional error committed by the trial court, it did not have a substantial and injurious effect or influence in the jury's verdict because, as noted by the appellate court, the defense had an opportunity on redirect to rehabilitate the defendant's credibility. *Id.* at 1088. The Court dismisses ground two of the Petition.

 The Court also dismisses ground three of the Petition because the state appellate court found the ineffective assistance of counsel claims, raised in Petitioner's second petition for post-conviction relief, were waived because she failed to raise them in the first petition for post-conviction relief. The Court is not persuaded by Petitioner's argument that the state's preclusionary rule was unclear at the time she allegedly violated it, which was when she filed the first state petition for post-conviction relief: August 3, 1998. This Court believes that the state preclusionary rule has been clear at least since the 1996 update to the comment to Rule 32.2: "... some issues not raised at trial, on appeal, or in a previous collateral proceeding may be deemed waived without considering the defendant's personal knowledge, unless such knowledge is specifically required to waive the constitutional right involved."

This mirrors the answer given by the Arizona Supreme Court in *Stewart v. Smith* to the question certified from the United States Supreme Court regarding the meaning of Rule 32.2, which was: "whether an asserted claim was of 'sufficient constitutional magnitude' to require a knowing, voluntary and intelligent waiver depended upon the merits of the particular claim or merely upon the particular right alleged to have been violated?" The Arizona Supreme Court answered, it was the latter. *Stewart v. Smith,* 202 Ariz. 446, 46 P.3d 1067, 1071 (2002). The case certified by the Supreme Court questioned the understanding of the law in 1995, if a petitioner asserted ineffective assistance of counsel for the first time in a successive Rule 32 petition. The Arizona Supreme Court explained that the question of preclusion is determined by the nature of the right allegedly affected by counsel's ineffective performance. *Id.*

The acts and omissions by trial counsel that Petitioner raises in her ineffective assistance of counsel claim did not involve or affect any of the type of basic or personal rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial that would require a knowing, voluntary and intelligent waiver. Consequently, the ineffective assistance of counsel claims were waived by the failure to bring them in the first petition for post-conviction relief. The Magistrate Judge correctly found this state-preclusionary rule to be an independent and adequate procedural bar, (R & R at 1091–92), forecloses federal review, *id.* at 1089 (citations omitted).

### CONCLUSION

After *de novo* review of the issues raised in the parties' Objections, this Court agrees with the findings of fact and conclusions of law made by the Magistrate Judge in his R & R. The Court dismisses grounds two and three of the Petition and grants relief on ground one of the Petition.

**Accordingly,**

**IT IS ORDERED** that the Report and Recommendation is adopted as the Opinion of the Court.

**IT IS FURTHER ORDERED** that the Second Amended Petition (document 34) is GRANTED IN PART AND DENIED IN PART.

**IT IS FURTHER ORDERED** that the Second Amended Petition is GRANTED on Ground One and DISMISSED on Grounds Two and Three.

**IT IS FURTHER ORDERED** that Respondents shall release Petitioner from custody unless, within 90 days from the entry of Judgment, retrial proceedings are initiated in state court.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter Judgment accordingly.

### ORDER

BERNARDO P. VELASCO, United States Magistrate Judge.

On November 28, 2001, Petitioner, an inmate confined in the Arizona State Prisons Complex in Perryville, Arizona, filed a *pro se* Petition for Writ of Habeas Corpus by a Person in State Custody, pursuant to Title 28, U.S.C. § 2254. (Doc. No. 1.)[1] A Second Amended Petition ("Petition") was filed on September 27, 2007. (Doc. No. 34.) Respondents filed an Answer to the Petition on March 3, 2008. (Doc. No. 44.) Petitioner filed a Reply on June 16, 2008. (Doc. No. 49.)

Pursuant to the Rules of Practice of this Court, this matter was referred to Magistrate Judge Bernardo P. Velasco for a Report and Recommendation.

For the reasons discussed below, the Magistrate Judge recommends that the District Court enter an order DISMISSING Grounds Two and Three, and GRANTING RELIEF as to Ground One.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Trial Court Proceedings*

The trial court briefly summarized the background and facts of the state court proceedings as follows:

During the late night hours of December 21, 1992/early morning hours of December 22, 1992, Trinidad Lopez, age 51, was shot by Miss Celaya, then 14 years of age, and he died as a result of injuries sustained in the shooting. The medical examiner determined that Trinidad Lopez died of blood loss as a result of a single gunshot wound to his upper right buttocks area. (RT 9/27/94, ¶. 36–40)

The State's theory was that Miss Celaya shot Mr. Lopez during the course of an armed robbery and carjacking. RT 9/24/94, 146–14. Gina Celaya's defense was that she shot Trinidad Lopez in self-defense during a struggle in which Trinidad Lopez sexually assaulted her. (RT 9/27/94, ¶. 99–109)

On Tuesday evening, December 22, 1992 at approximately 8:00 p.m. the victim's family made a missing person report to the Tucson Police Department. Shortly thereafter, Mr. Lopez' vehicle was involved in an accident in South Tucson. (RT 1/4/93 Juvenile Probable Cause Hearing, page 21). At that time Baby Laguna, the defendant's friend, was driving the vehicle, the defendant was seated in the passenger side of the vehicle, and in the camper back area were young teenage girls April Ornelas, Sonya Levya and Gloria Espinosa, all of whom were friends of Gina Celaya. While the girls were "cruising" in the decedent's vehicle, the victim's daughter and her husband saw the vehicle and gave chase. Baby Laguna fired shots at the family's pursuing vehicle. Subsequently, Ms. Laguna crashed the vehicle. (RT 9/22/94 second day of jury trial). The girls fled to Rebecca Antone's house. (RT 9/22/99 page 75). Testimony at trial by Ms. Espinosa, Ms. Leyva, Ms. Ornelas and Ms. Antone indicated that Gina Celaya told them that she had killed Trinidad Lopez. The three girls and two of their parents went

---

1. "Doc. No." refers to documents in this Court's file.

to the police station to report the incident and what they had been told.

Efforts to locate Mr. Lopez' body were unsuccessful. Subsequently, a transient, Vernon Osborne, discovered Mr. Lopez' body in the desert near the Los Reales Landfill on December 24, 1992. Mr. Osborne flagged down a vehicle, went to a convenience store and contacted the police.

Ms. Celaya was ultimately arrested for the homicide of Mr. Lopez. On January 4 and 12, 1993 Judge Collins conducted a Probable Cause Hearing at the Juvenile Court. The Court on January 4, 1993 appointed an attorney to represent Baby Laguna. (RT 1/4/93 pages 5–6).

Thereafter, on April 1, 13 and 14, the Court conducted a lengthy Amenability Hearing. The defendant was ultimately transferred to adult court to face charges.

Defendant presented numerous motions which were heard and resolved by the Court. On September 21 through September 29, 1994 the defendant was tried before a jury for First Degree Murder and Armed Robbery. The defendant was convicted of First Degree Murder and Armed Robbery. Th[e] Court sentenced the defendant to a term of 25 years to life on the First Degree Murder Charge and a consecutive term of 10.5 years on the Armed Robbery. (Answer, Ex. D: M.E. 11/5/99, at 2–3.)

## B. *Appeal*

The Arizona Court of Appeals affirmed Petitioner's conviction and sentence on direct appeal. (Answer, Ex. A.) The court of appeals addressed Petitioner's arguments, rejecting Petitioner's contentions that (1) the trial court should have allowed Petitioner's taped statement's to be played to the jury; (2) the prosecutor engaged in misconduct in saying that the defense could have introduced Petitioner's prior statements; (3) the trial court improperly limited defense efforts to prove the violent character of the decedent in support of defendant's claim of self-defense; (4) the trial court should have permitted impeachment of a prosecution witness by allowing inquiry into her activities in inducing another to engage in prostitution; (5) Petitioner's pretrial statements were involuntary; and (6) the consecutive sentences in the case violated the double-jeopardy clause or A.R.S. § 13–116, or that the imposition of the sentences constituted cruel and unusual punishment. (*Id.*)

Petitioner appealed that decision to the Arizona Supreme Court, and on September 18, 1996, that court denied review. (*See* Answer, at 2; Appendix to Memorandum of Points and Authorities to Petition for Writ of Habeas Corpus (hereafter "Appendix"), Ex. B.)

## C. *First Petition for Post–Conviction Relief*

Petitioner's uncontested assertion is that the notice of post conviction relief was filed on October 7, 1996. (*See* Second Amended Petition at 3.) Petitioner's first petition for post-conviction relief was filed on August 3, 1998. (*See* Appendix, Ex. C, at 1.) Petitioner presented the following issues in her petition: (1) Petitioner's conviction and sentence were in violation of the U.S. and Arizona Constitutions because two members of the Tucson Police Department committed perjury at her trial; (2) The testimony of Vernon Osborne at the Rule 32 hearing constitutes newly-discovered evidence; (3) The recantation of Magdalene "Baby" Laguna constitutes newly-discovered evidence; and (4) *State v. Dunlap*, 187 Ariz. 441, 930 P.2d 518 (Ariz.App.1996) constitutes a significant change in the law. (*Id.* at 3–4.) The trial court conducted an evidentiary hearing and thereafter issued

a minute entry on November 5, 1999, denying relief on all four issues. (*Id.* at 2)

On January 10, 2000, Petitioner filed a petition for review with the Arizona Court of Appeals to review the trial court's denial of post-conviction relief. (*See* Second Amended Petition, at 3) The court of appeals granted review but denied relief on October 17, 2000. (Appendix, Ex. D.) No motion for reconsideration or petition for review from that decision was filed. The Arizona Court of Appeals issued its mandate on November 30, 2000. (Appendix, Ex. E.)

### D. *First Federal Habeas Petition and Amended Petition*

Petitioner filed her first petition for post-conviction relief in District Court on November 28, 2001. (Doc. No. 1.) The petition contained three exhausted claims, and one unexhausted ineffective assistance of counsel claim. (*Id.*) The District Court subsequently dismissed the petition without prejudice, with leave to file an amended petition deleting the unexhausted claim, and held the federal habeas proceedings in abeyance until after Petitioner exhausted the unexhausted claim. (Doc. No. 11.) Petitioner filed the First Amended Petition on January 30, 2002. (Doc. No. 13.) The Amended Petition was held in abeyance while Petitioner sought exhaustion of her ineffective assistance of counsel claims in state court. (Doc. No. 15–28.)

### E. *Second Petition for Post–Conviction Relief*

On November 23, 2001, Petitioner filed her second notice of post-conviction relief in state court. (*See* Second Amended Petition, Supp. Ex. 8, at 6.) On February 20, 2002, Petitioner filed her second petition for post-conviction relief, raising claims of ineffective assistance of counsel and one claim, in the alternative, of a change in the law. (Second Amended Petition, Supp. Ex. 1.)

On October 24, 2003, the trial court denied the petition with regard to all assertions of ineffective assistance of trial counsel, finding the claims precluded. (*Id.*, Supp. Ex. 8, at 13.) The trial court addressed each claim nonetheless, and made extensive findings of fact as to each claim "so that there [would] be no questions as to this Court's Findings and Conclusions in the event this issue is raised yet again." (*Id.* at 14.) The trial court concluded that trial counsel was not ineffective with regard to all issues raised. (*Id.* at 36.) The trial court granted relief with regard to the claim asserted in the alternative; concluding that there had been a significant change in the law, and that the court had been influenced by the State's assertion that there was a presumption that the Court impose consecutive sentences. (*Id.* at 38.) Accordingly, the trial court resentenced Petitioner to concurrent, rather than consecutive, sentences of life imprisonment without the possibility of release for 25 years and 10.5 years imprisonment, for first degree murder and armed robbery, respectively. (*Id.*, Supp. Ex. 8, at 38, and Supp. Ex. 9, at 2–3.)

On October 7, 2004, Petitioner filed a petition for review with the Arizona Court of Appeals, along with a motion to accept the oversized petition for review, asserting that the trial court abused its discretion by finding that trial counsel did not provide ineffective assistance of counsel. (*Id.*, Supp. Ex. 10.11) The court of appeals denied the motion to accept the oversized petition, and withdrew the petition for review, returned the petition to counsel, with leave to refile a petition in compliance with Rule 32.9(c)(1), Ariz. R.Crim. P. (*Id.*, Supp. Ex. 12.) A revised petition was submitted on January 13, 2004. (*Id.*, Supp. Ex. 13.) In a memorandum decision filed August 22, 2006, the court of appeals granted review, but denied relief. (*Id.*, Supp. Ex. 14.) The court of appeals found the inef-

fective assistance of counsel claims "indeed precluded in this second post-conviction proceeding because they could have been but were not raised in her first Rule 32 proceeding." (*Id.*, Supp. Ex. 14, at 3.) Although the appellate court questioned the trial court's finding that the record supported the finding that Petitioner personally waived her claims of ineffective assistance "after being advised of the necessity to raise them by her appellate and Rule 32 counsel both orally and in writing"; the appellate court did not reach that question because it rejected Petitioner's assertion that waiver of a claim of ineffective assistance of counsel under Arizona law requires an informed, voluntary personal waiver. (*Id.*)

Petitioner filed a petition for review of the appellate court's decision with the Arizona Supreme Court, urging the supreme court to find that the claims were not precluded unless they were knowingly, intelligently and voluntarily waived. (*Id.*, Supp. Ex. 15, at 7) The supreme court denied review on June 5, 2007. (*Id.*, Supp Ex. 16.)

### F. Second Amended Federal Habeas Petition

On September 26, 2007, the District Court, noting that the appellate court had issued the mandate on August 2, 2007, lifted the stay and returned this case to the Court's active docket. (Doc. No. 33.) The Court further granted Petitioner's motion to amend the petition and ordered the Clerk of Court to file the lodged Second Amended Petition. (*Id.*) The amended petition had the effect of reinserting the newly exhausted claim, which directly related back to the original petition, and deleting the moot claim regarding concurrent sentences. (*Id.*)

The Second Amended Petition along with Supplemental Exhibits 1 through 21 was filed by the Clerk of Court on Septem-

ber 27, 2007. (Doc. No. 34–38.) Respondents filed an Answer with Exhibits A through J attached on March 3, 2008. (Doc. No. 44.) A Reply with Exhibits A through N was filed by Petitioner on June 16, 2008 (Doc. No. 49.)

## II. DISCUSSION

### A. Standard of Review

Because Petitioner filed her petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) ("AEDPA").

### B. Statute of Limitations

A one year period of limitation shall apply to an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court. 28 U.S.C. § 2244(d)(1). Under the AEDPA, a state prisoner must generally file a petition for writ of habeas corpus within one year from "the date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review [.]" 28 U.S.C. § 2244(d)(1)(A). "The time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation[.]" 28 U.S.C. § 2244(d)(2).

### C. Exhaustion of State Remedies

▉▉ Before a federal court may review a petitioner's claims on the merits, a petitioner must exhaust his state remedies, which means he must have presented in state court every claim raised in his federal habeas petition. *See Coleman v. Thompson*, 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) (a state prisoner in a federal habeas action must exhaust

his federal claims in the state courts "by invoking one complete round of the State's established appellate review process" before he may submit those claims in a federal habeas petition); *Swoopes v. Sublett,* 196 F.3d 1008, 1010 (9th Cir.1999). Exhaustion of state remedies is required in order to give the state the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (internal quotation marks and citations omitted). In order to provide a state with this necessary opportunity, "the prisoner must fairly present his claim in each appropriate state court ... thereby alerting that court to the federal nature of the claim." *Id.* (internal quotation marks and citations omitted).

 A claim is "fairly presented" if the petitioner has described the operative facts and legal theories on which his claim is based. *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Tamalini v. Stewart,* 249 F.3d 895, 898 (9th Cir.2001). In state court, the petitioner must describe not only the operative facts but also the asserted constitutional principle, for if "state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Duncan v. Henry,* 513 U.S. 364, 365–66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."). A petitioner does not ordinarily "fairly present" a federal claim to a state court if that court must read beyond a petition, brief, or similar papers to find material that will alert it to the presence of a federal claim. *Baldwin,* 541 U.S. at 32–33, 124 S.Ct. 1347 (rejecting contention that petition fairly presented federal ineffective assistance of counsel claim because "ineffective" is a term of art in Oregon that refers only to federal law claims, since petitioner failed to demonstrate that state law uses "ineffective assistance" as referring only to federal law rather than a similar state law claim); *Harless,* 459 U.S. at 6, 103 S.Ct. 276 (holding that mere presentation of facts necessary to support a federal claim, or presentation of state claim similar to federal claim, is insufficient; petitioner must fairly present the substance of the federal claim); *Hiivala v. Wood,* 195 F.3d 1098 (9th Cir.1999) (holding that petitioner failed to exhaust federal due process issue in state court because petitioner presented claim in state court only on state grounds); *Gatlin v. Madding,* 189 F.3d 882 (9th Cir. 1999) (holding that petitioner failed to "fairly present" federal claim to state courts where he failed to identify the federal legal basis for his claim).

In Arizona, exhaustion is satisfied if a claim is presented to the Arizona Court of Appeals. A discretionary petition for review to the Supreme Court of Arizona is not necessary for purposes of federal exhaustion. *Swoopes,* 196 F.3d at 1010; *State v. Sandon,* 161 Ariz. 157, 777 P.2d 220 (1989) (in non-capital cases, state remedies are exhausted by review by the court of appeals); *Castillo v. McFadden,* 399 F.3d 993, 998 (9th Cir.2005) (quoting *Swoopes* for assertion that in cases not carrying a life sentence or the death penalty, "claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them").

 The Ninth Circuit Court of Appeals has explained the distinction between exhaustion and procedural default as follows:

The exhaustion requirement is distinct from the procedural default rule. The exhaustion doctrine applies when the state court has never been presented with an opportunity to consider a petitioner's claims and that opportunity may still be available to the petitioner under state law. In contrast, the procedural default rule barring consideration of a federal claim applies only when a state court has been presented with the federal claim, but declined to reach the issue for procedural reasons, or if it is clear that the state court would hold the claim procedurally barred. Thus, in some circumstances, a petitioner's failure to exhaust a federal claim in state court may *cause* a procedural default. A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion; there are no state remedies any longer "available" to him. A federal claim that is defaulted in state court pursuant to an adequate and independent procedural bar may not be considered in federal court unless the petitioner demonstrates cause and prejudice for the default, or shows that a fundamental miscarriage of justice would result if the federal court refused to consider the claim.

*Cassett v. Stewart*, 406 F.3d 614, 621 n. 5 (9th Cir.2005) (internal quotation marks and citations omitted). In other words, a habeas petitioner's claims may be precluded from federal review in either of two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729–30, 111 S.Ct. 2546. Second, the claim may be procedurally defaulted in federal court if the petitioner failed to present the claim in a necessary state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find

the claims procedurally barred." *Id.* at 735 n. 1, 111 S.Ct. 2546. This is often referred to as "technical" exhaustion, because although the claim was not actually exhausted in state court, the petitioner no longer has an available state remedy.

■■■■■■ If a claim is procedurally defaulted, it may not be considered by a federal court unless the petitioner demonstrates cause and prejudice to excuse the default in state court, or demonstrates that a fundamental miscarriage of justice would result. *Id.* at 750, 111 S.Ct. 2546; *Sawyer v. Whitley*, 505 U.S. 333, 338–339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). If a claim has never been fairly presented to the state court, a federal habeas court may determine whether state remedies remain available. *See Harris v. Reed*, 489 U.S. 255, 269–70, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Teague v. Lane*, 489 U.S. 288, 298–99, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *White v. Lewis*, 874 F.2d 599, 602 (9th Cir.1989).

■■■■■■ Cause is defined as a "legitimate excuse for the default," and prejudice is defined as "actual harm resulting from the alleged constitutional violation." *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir.1991); *see Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (a showing of cause requires a petitioner to show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule"). Prejudice need not be addressed if a petitioner fails to show cause. *Thomas*, 945 F.2d at 1123 n. 10. To bring himself within the narrow class of cases that implicate a fundamental miscarriage of justice, a petitioner "must come forward with sufficient proof of his actual innocence," *Sistrunk v. Armenakis*, 292 F.3d 669, 672–73 (9th Cir.2002) (internal quotation marks and citations omitted), which can be shown when "a petitioner 'presents

evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error.'" *Id.* at 673 (quoting *Schlup v. Delo,* 513 U.S. 298, 316, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)).

### D. *Standard of Review: Merits*

Petitioner's habeas claims are governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA). *See Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reduc[ing] delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan,* 550 U.S. 465, 473, 475, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007) (quoting *Woodford v. Garceau,* 538 U.S. 202, 206, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings' ... demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti,* 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam) (quoting *Lindh,* 521 U.S. at 333 n. 7, 117 S.Ct. 2059).

■ Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

■ The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett,* 393 F.3d 943, 969 (9th Cir.2004). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming,* 423 F.3d 1085, 1091 (9th Cir.2005) (*citing Ylst v. Nunnemaker,* 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)); *Insyxiengmay v. Morgan,* 403 F.3d 657, 664 (9th Cir.2005).

■ "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor,* 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams,* 529 U.S. at 365, 120 S.Ct. 1495; *see Carey v. Musladin,* 549 U.S. 70, 74, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006); *Clark v. Murphy,* 331 F.3d 1062, 1069 (9th Cir.2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams,* 529 U.S. at 381, 120 S.Ct. 1495; *see Musladin,* 127 S.Ct. at 654; *Casey v. Moore,* 386 F.3d 896, 907 (9th Cir.2004). Nevertheless, while only Supreme Court authority is binding, circuit court prece-

dent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark,* 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495; *see Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court cases] to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams,* 529 U.S. at 406, 120 S.Ct. 1495; *see Lambert,* 393 F.3d at 974.

■■■■ Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams,* 529 U.S. at 407, 120 S.Ct. 1495. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision

was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495; *Visciotti,* 537 U.S. at 25, 123 S.Ct. 357.

■■■■ Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller–El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (*Miller–El II* ). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (*Miller–El I* ); *see Taylor v. Maddox,* 366 F.3d 992, 999 (9th Cir.2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan,* 550 U.S. at 473–474, 127 S.Ct. 1933; *Miller–El II,* 545 U.S. at 240, 125 S.Ct. 2317. However, it is only the state court's factual findings, not its ultimate decision, that are subject to § 2254(e)(1)'s presumption of correctness. *Miller–El I,* 537 U.S. at 341–42, 123 S.Ct. 1029 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

■■■■ As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir.2003); *Pirtle v. Morgan,* 313 F.3d 1160, 1167 (9th Cir.2002); *Delgado v. Lewis,* 223 F.3d 976, 981–82 (9th Cir.2000). In those circumstances, a federal court independently re-

views the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes,* 336 F.3d at 853; *Pirtle,* 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle,* 313 F.3d at 1167 (citing *Delgado,* 223 F.3d at 981–82); *see also Himes,* 336 F.3d at 853. Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no state court decision on [the] issue to which to accord deference." *Pirtle,* 313 F.3d at 1167; *see also Menendez v. Terhune,* 422 F.3d 1012, 1025–26 (9th Cir. 2005); *Nulph v. Cook,* 333 F.3d 1052, 1056–57 (9th Cir.2003).

## III. ANALYSIS

### A. *Timeliness*

Respondents submit that the Petition exceeded the 1–year statute of limitations and there is no statutory or equitable basis for tolling the limitations period. (*See* Answer, at 5–8.)

Respondents assert that Petitioner's conviction and sentence became final on October 17, 2000, when the Arizona Court of Appeals denied relief from the trial court's denial of post-conviction relief. Respondents further assert that the statute of limitations began to run the next day, and therefore, to be timely under the AEDPA, Petitioner would have had to file the present petition by October 18, 2001.[2] Under Respondents calculation, Petitioner's federal petition, filed on November 28,

2001, is untimely, absent statutory or equitable tolling, by 41 days.

Petitioner responds that the correct date to begin calculating the AEDPA limitations period is the date that the court of appeals issued its mandate, November 30, 2000. Thus, to be timely under this calculation, Petitioner would have had to file the present petition by November 30, 2001. Accordingly, Petitioner's original petition, filed on November 28, 2001, is timely even without regard to statutory or equitable tolling of the limitations period.

### 1. *Date on which conviction and sentence became final.*

Petitioner's conviction became final on December 17, 1996, 90 days after her direct appeal was denied by the Arizona Supreme Court on September 18, 1996, when the time for filing a petition for a writ of certiorari from the United States Supreme Court expired. *See* 28 U.S.C. § 2244(d)(1)(A); *See Wixom v. Washington,* 264 F.3d 894, 897 (9th Cir.2001).

### 2. *Statutory Tolling*

The limitations period was tolled immediately, however, by the pendency of Petitioner's petition for post conviction relief. *See* 28 U.S.C. § 2244(d)(2). The notice of post-conviction relief had been filed in the trial court on October 7, 1996, prior to the conclusion of direct review. There was no gap between the conclusion of direct review, and Petitioner's properly filed application for state post-conviction review. Thus, the issue is not when direct review became final under § 2244(d)(1)(A), rather, this Court must determine how long Petitioner's petition for post-conviction relief

---

**2.** Although not essential to this determination, or the timeliness calculations, Respondents have miscalculated the time period for timely filing even assuming that the clock starts the date that the court of appeals denied relief, October 17, 2000. The limitations period expires a year after the judgment becomes final,

not a year and a day, as stated in Respondents Answer (Doc. No. 44 at 5.) *See Patterson v. Stewart,* 251 F.3d 1243, 1247 (9th Cir.2001). Thus the filing deadline would be October 17, 2001, not October 18, 2001, as asserted by Respondents.

was "pending" for purposes of tolling the limitations period pursuant to § 2244(d)(2).

 Until an application for state post-conviction relief has achieved final resolution through the State's post-conviction procedure it remains "pending." *See Carey v. Saffold,* 536 U.S. 214, 219–20, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002); *See also Hemmerle v. Schriro,* 495 F.3d 1069, 1077 (9th Cir.2007). In *Carey,* the Supreme Court interpreted the word "pending" and explained that, "until the application [for post-conviction or other collateral review] has achieved final resolution through the State's post-conviction procedures, by definition, it remains 'pending.'" *Carey,* 536 U.S., 214 at 220, 122 S.Ct. 2134. To do so, the Court looked to the definition of "pending" as "in continuance" or "not yet decided." *Id.* at 219, 122 S.Ct. 2134 (quoting Webster's Third New International Dictionary 1669 (1993)).

Respondents assert that the thirty days following the denial of Petitioner's petition for review to the court of appeals, the time during which Petitioner could have, but did not, seek review in the Arizona Supreme Court, is not tolled, because there is no longer any action "pending" in the state courts. Respondents cite *Bunney v. Mitchell,* 241 F.3d 1151 (9th Cir.2001) (*Bunney I*) in support of this argument.

In *Bunney I,* the Ninth Circuit held that § 2244(d)(2) does not toll the statute of limitations for the 90–day period following the denial of a state-court petition because a petition for certiorari in the United States Supreme Court is not State post-conviction review or other State collateral review. *Id.* at 1156. Although the Ninth Circuit did note, as Respondents assert, that Congress did not include anything comparable to the phrase found in § 2244(d)(1) "or the expiration of the time for seeking such review" in the subsection that applies to state post-conviction petitions, the Ninth Circuit explicitly limited this holding to the period of time during which Petitioner could have sought certiorari in the United States Supreme Court. *Id.* The United States Supreme Court has since confirmed that a petition is not pending while a Petitioner is seeking further *federal review* of an application for state court relief. *Lawrence v. Florida,* 549 U.S. 327, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007) (emphasis added).

The opinion in *Bunney I,* however, was withdrawn when the Ninth Circuit expressed its uncertainty over when a summary denial of a petition for writ of habeas corpus before the California Supreme Court becomes final. The court noted that there were two plausible ways to read the rules at issue in that case: Rule 24(a), in which a decision of any kind becomes final 30 days after filing and Rule 27(a), in which the California Supreme Court may grant a rehearing after its own decision in any cause, respectively. The Ninth Circuit noted that Rule 24(a) could be read by itself and literally, resulting in a decision of any kind becoming final 30 days after filing. Alternatively, the two rules could be read together and construed as not encompassing a summary denial of a petition for writ of habeas corpus because a summary denial would not encompass the determination of a "cause." Thus, the specific interpretations of the state rules at issue were directly determinative to the Ninth Circuit's determination to withdraw its opinion in *Bunney I.* Accordingly, the Ninth Circuit requested that the Supreme Court of California accept certification and resolve the question. *Bunney v. Mitchell,* 249 F.3d 1188, 1191 (9th Cir.2001) (*Bunney II*). The California Supreme Court declined, and the Ninth Circuit resolved the issue by relying on its own interpretation of Rule 24(a) and state decisions in determining that the denial of the petitioner's state-court habeas petition was not final for 30 days, and found the federal

petition in that case timely. *Bunney v. Mitchell,* 262 F.3d 973 (9th Cir.2001). The facts in *Bunney* are distinguishable from the facts of this case, however, as they rely on a different set of state procedural rules. Thus, contrary to Respondent's assertion, the holding in *Bunney* is inapplicable to this case, except to the extent it reinforces the conclusion that a federal court should look to the rules of the state to determine when a state decision on a petition is "final" to determine when the petition is still pending under § 2244(d)(2).[3] Although the Ninth Circuit has addressed finality issues similar to the one before this Court, it has not decided the issue in a case where it has been fully argued and considered in a factual and procedural posture equivalent to the present case.

In *Wixom v. Washington,* 264 F.3d 894 (9th Cir.2001), the issue was whether the petitioner's judgment became final at the time the Washington Court of Appeals denied his motion to modify the commissioner's ruling, or upon issuance of the mandate. *Id.* at 896. The petitioner argued that the one-year limitations period did not begin to run until the mandate had issued. *Id.* at 897. Relying on Washington procedural rules, the Ninth Circuit held that the Washington appellate court's denial of Wixom's motion to modify the judgment, and not the mandate, concluded review. *Id.* at 897–98. Washington state procedural rules provided that a "decision terminating review" by the Washington appellate court "unconditionally conclude[d] direct review." *Id.* at 898. The denial of a motion to modify the judgment was a "decision terminating review" under Washington law. *Id.* Accordingly, the Ninth Circuit determined that because the

decision, and not the mandate, concluded direct review under Washington law, the decision commenced the one-year limitations period imposed by the AEDPA. *Id.*

*Wixom* is clearly distinguishable from this case, as, in Arizona, there is no equivalent to the Washington Rules that formed the basis for the *Wixom* decision. There is no similar Arizona rule stating when an appellate case ends.

In another distinguishable case, the Ninth Circuit court in *Hemmerle* was faced with the dilemma of determining when, under § 2244(d)(2), a petition for post-conviction relief was finally "determined" and the petitioner's state post-conviction proceedings became final. *Hemmerle v. Schriro,* 495 F.3d 1069, 1077 (9th Cir.2007). The petitioner proffered an argument that a letter issued after the Supreme Court's denial of review from the clerk of the court of appeals, notably not a mandate, but instead a letter which facilitated the performance of a ministerial function of returning the record to the trial court pursuant to Rule 32.9(h) was (1) a mandate, and (2) the date on which the proceedings became final. *Id.* at 1077. The Ninth Circuit rejected the arguments, noting that Rule 32.9(h) states that "[w]hen the matter is determined, the clerk of the appellate court shall return the record to the appropriate trial court for retention according to law" and thus, the letter was not a mandate, rather, something that occurs "when the matter is determined" and that "the matter was determined by the Arizona Supreme Court on [the date] when it denied review" because there was "nothing left for it do" and thus "nothing remained 'pending' for pur-

---

**3.** Conversely, section 2244(d)(1)(A), by virtue of inclusion of the words "by the conclusion of direct review or the expiration of the time for seeking such review" makes it clear that finality is to be determined by reference to a

uniform federal rule. *See Hemmerle,* 495 F.3d 1069, 1074 (2007) (citing *Clay v. United States,* 537 U.S. 522, 531, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003)).

poses of § 2244(d)(2)." *Id.* at 1077. This case is factually distinct from *Hemmerle.* Unlike the so-called "mandate" in *Hemmerle,* the mandate issued in the present case was a mandate issued commanding the trial court that such proceedings be had in the case as required to comply with the memorandum decision of the court of appeals. (Answer, Ex. F.) The Ninth Circuit in *Hemmerle* did not have an actual mandate before it, specifically finding that the letter referred to by petitioner as a "mandate" was "not equivalent to the issuance of the mandate." *Hemmerle,* 495 F.3d at 1077. The Ninth Circuit in *Hemmerle* specifically acknowledged that there was no requirement that the appeals court wait a certain amount of time before sending the record back, that the ministerial function was to be performed, pursuant to Rule 32.9(h) only after the "matter is determined." *Id.* Thus, the Ninth Circuit's decision in *Hemmerle,* that the matter was "determined" by the Arizona Supreme Court on the date it denied review did not settle the issue which is squarely before this Court: Under Arizona law, does a petition for post-conviction relief remain pending, for purposes of statutory tolling under 28 U.S.C. § 2244(d)(2), until the date the appellate court issues its decision, or the date the court issues its mandate?

█ Under Arizona law, appellate review in a criminal case is not final until the mandate has issued.[4] Arizona courts have expressly stated that a judgment is not final until the mandate has issued. "The decision of the appellate court does not become final until the order (or mandate) is filed." *State v. Ward,* 120 Ariz. 413, 415, 586 P.2d 974 (1978); *see also Borrow v. El Dorado Lodge, Inc.,* 75 Ariz. 218, 220, 254 P.2d 1027 (1953) (stating appellate court's

judgment becomes effective on "the date of the issuance of the mandate"); *State v. Sepulveda,* 201 Ariz. 158, 159 n. 2, 32 P.3d 1085 (Ariz.App.2001) ("A conviction becomes final upon the issuance of the mandate affirming the conviction on direct appeal and the expiration of the time for seeking certiorari in the United States Supreme Court."); *State v. Dalglish,* 183 Ariz. 188, 190, 901 P.2d 1218 (Ariz.App. 1995) ("We conclude that Petitioner's case was final on ... the date the Arizona Supreme court issued its mandate."); *State v. Jones,* 182 Ariz. 432, 432–434, 897 P.2d 734 (Ariz.App.1995) ("It is true that, in cases where there is an appeal pending, the final deadline [to file for post-conviction relief] will be unknown until the appeal is resolved and the mandate has issued."); *Owen v. Shores,* 24 Ariz.App. 250, 537 P.2d 978, 981 (1975) ("There was still the necessity for issuance of the Court's mandate, and for the trial court to take the necessary action to enforce the mandate...."); *State v. Febles,* 210 Ariz. 589, 592, 115 P.3d 629 (Ariz.App.2005) (Conviction became final on date the court issued the mandate after time for further review expired.).

Thus, looking to Arizona law, as the previously discussed cases direct this Court to do, Arizona Rule of Criminal Procedure 31.23(a) provides that, "[i]f there has been no motion for reconsideration and no petition for review filed, the clerk of the Court of Appeals shall issue the mandate at the expiration of the time for filing such motion or petition." Thus, Petitioner's Rule 32 petition was pending, as the Supreme Court has defined that term in *Carey,* until it reached final resolution upon issuance of the court of appeals mandate on November 30, 2000. Accord-

---

4. Under Arizona Rules of Criminal Procedure, "[i]f there has been no motion for reconsideration and no petition for review filed, the clerk of the Court of Appeals shall issue the mandate at the expiration of the time for the filing of such motion or petition." Ariz. R.Crim. P. 31.23(a)(1).

ingly, the Petition, filed on November 28, 2001, is timely.

### 3. Equitable Tolling

Alternatively, Petitioner is entitled to equitable tolling under these circumstances.

 Respondents note that the Supreme Court has not decided whether equitable tolling applies under the AEDPA, citing *Lawrence v. Florida*, 549 U.S. 327, 127 S.Ct. 1079, 1085, 166 L.Ed.2d 924 (2007) and *Pace v. DiGuglielmo*, 544 U.S. 408, 418 n. 8, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005), and do not concede that it does. (Answer, at 7.) The Ninth Circuit has held that 2244(d) allows for equitable tolling. *Harris v. Carter*, 515 F.3d 1051, 1055 n. 4 (9th Cir.2008). A petitioner is entitled to equitable tolling of the statute of limitations if he can show: " '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Lawrence v. Florida*, 549 U.S. 327, 336, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005)). "Equitable tolling is typically granted when litigants are unable to file timely petitions as a result of external circumstances beyond their direct control." *Harris*, 515 F.3d at 1055. "Equitable tolling is typically denied in cases where a litigant's own mistake clearly contributed to his predicament." *Id.*

Respondents argue that the correct standard to determine the presence of an "extraordinary circumstance" can be found in *Lott v. Mueller*, 304 F.3d 918, 922 (9th Cir.2002) (Extraordinary circumstances are those circumstances "beyond a prisoner's control [which] make it impossible to file a petition on time.") (citations omitted). The Ninth Circuit in *Harris* noted that since the Supreme Court had decided *Pace*, the Ninth Circuit had not yet settled on a standard of application. *Harris*, 515

F.3d at 1055 (citing for comparison *Rasberry v. Garcia*, 448 F.3d 1150, 1153 (9th Cir.2006) and *Roy v. Lampert*, 465 F.3d 964, 969 (9th Cir.2006). The court noted that the only case to address the issue noted the possibility that *Pace* had "lowered the bar somewhat" compared with the previous standard. *Harris*, 515 F.3d at 1055, citing *Espinoza–Matthews v. California*, 432 F.3d 1021, 1026 n. 5 (2005)). *Harris* did not decide whether a substantive difference existed between the two standards because the Ninth Circuit granted equitable tolling based on the petitioner's reliance in good faith on then-binding circuit precedent in making a tactical decision to delay filing a federal habeas decision, even though Harris *could* have filed a timely habeas petition. *Harris*, 515 F.3d at 1055.

#### a. Diligence

Petitioner argues that she diligently pursued her rights, expeditiously exhausting state remedies, and procuring funding for counsel to pursue federal remedies. (Reply, at 13.) After present counsel was retained, counsel avows that he diligently located and obtained records from several different attorneys, reviewed extensive volumes of records, viewed evidence located both in court and at the police department, and independently investigated and prepared the necessary briefs for filing the habeas corpus petition in this in this case. (Reply, at 13, Exhibits to Reply, Ex. B.)

There is no question that Petitioner acted diligently in this matter.

#### b. Extraordinary Circumstances

As discussed above, federal courts are to look to state law in order to determine whether a state petition for post-conviction relief is still "pending" for purposes of tolling under § 2244(d)(2). Neither case in effect at the time Petitioner filed her petition for post conviction relief in state court, *Bunney* and *Wixom*, addressed the

use of the date of the issuance of an appellate court mandate *under Arizona law*.

The cases cited by Petitioner establish conclusively that, under Arizona law, a petition for post-conviction relief is pending in Arizona state courts until the date the reviewing court issues its mandate. *See Borrow*, 75 Ariz. at 220, 254 P.2d 1027; *Lindus v. Northern Insurance Company of New York*, 103 Ariz. 160, 162, 438 P.2d 311 (1968) (*en banc*) ("Where the interests of justice outweigh the interest in bringing litigation to an end the court should recall the mandate."); *Sepulveda*, 201 Ariz. at 159 n. 2, 32 P.3d 1085; *Dalglish*, 183 Ariz. at 190, 901 P.2d 1218; *Jones*, 182 Ariz. at 432–434, 897 P.2d 734; and *Owen*, 537 P.2d at 981.

This was not a miscalculation of the deadline, or negligence on behalf of counsel, or simple inexcusable oversight. (*See* Reply, Exhibit B.) Counsel's calculation demonstrates good-faith reliance on existing precedent and constitutes "extraordinary circumstances" under *Harris*, 515 F.3d at 1054. Accordingly, Petitioner having demonstrated diligence and extraordinary circumstances, the Magistrate Judge finds that the time between the court of appeals decision on October 17, 2000, and the issuance of the mandate on November 30, 2000, is equitably tolled, and thus, the Petition is timely.

## B. *Ground One*

Petitioner argues that the trial court's exclusion of vital defense witnesses who would have testified to the decedent's prior acts of violence toward women and especially prostitutes, under circumstances similar to those in the present case, was contrary to clearly established law as determined by the United States Supreme Court and denied Gina Celaya's rights to due process, a fair trial and to present a defense, violating the 5th, 6th and 14th Amendments to the United States Consti-

tution, with substantial and injurious effect. (Petition, at 5.)

### 1. *Precluded testimony*

Petitioner asserts that testimony from the following three witnesses was erroneously precluded by the trial court, and that this issue was raised throughout the Arizona appellate system.

#### a. *Jacquelin Carranza*

Jacquelin ("Jackie") Carranza (aka Christie Dolan) was interviewed by the defense and the police prior to Petitioner's trial. (Appendix, Ex. H, I.) Ms. Carranza, a prostitute, recognized a photograph of the victim on television as a "date" of hers. (Appendix, Ex. H, at 3.) She had known the victim since 1988, but had most recently seen him in December, 1992. (*Id.*) Ms. Carranza stated that the first time she was with the victim, he drove her to an area "far out by the airport," and "down a dirt road . . . like a dump," abused her verbally and physically, and "scared the hell" out of her. (Appendix, Ex. H., at 4, 8.) Ms. Carranza remembered that, during her most recent encounter with the victim, he was wearing a baseball cap, and driving a small light blue or gray pickup truck. (Appendix, Ex. I, at 15.) Ms. Carranza also stated that the victim had told her about his work and his family-that he was married with two grown children, and worked in construction or the mines. (*Id.* at 23–26.)

#### b. *Teresa Larrivas*

Teresa Larrivas, a former prostitute, recognized the victim's photograph from the news and was interviewed by the Tucson Police Department prior to Petitioner's trial. (Appendix, Ex. J.) Ms. Larrivas recalled encountering the victim approximately six years before the interview. (*Id.* at 5.) Ms. Larrivas said that the victim was Hispanic, with short hair and a mustache, and kind of heavy, drove a blue truck, with a camper on it, and always used to wear a

baseball cap. (*Id.* at 8, 12.) Ms. Larrivas was certain of her identification, stating "I know it was him." (*Id.* at 13.) Ms. Larrivas remembered being picked up by the victim and being driven out of South Tucson to a place that was "just all desert." (*Id.* at 10, 14.) The victim informed Ms. Larrivas that he would not be paying her, and told her to get off the truck. (*Id.* at 15–17.) The victim grabbed Ms. Larrivas and took her to the back of the camper and raped her while she pleaded with him and struggled and told him "no." (*Id.* at 17–18.)

### c. *Francis Czybora*

Ms. Czybora, who had been a bartender at Ralph's Tavern, came forward after the trial had started and testified during a proffer. Ms. Czybora testified out of the presence of the jury that she had known the victim for 15–18 years, as a daily customer at Ralph's Tavern. (Appendix, Ex. K, RT 9/27/94, 210–211). Ms. Czybora knew him as a man who "liked to fight and he was very abusive to the other patrons" in the bar. (*Id.* at 214.) Ms. Czybora knew that prostitutes that went with him "come back beat up" and personally witnessed the victim slam a girl against the wall when she wouldn't go with him. (*Id.* at 215.) Ms. Czybora knew of several prostitutes from her work at the bar, and was told that the victim "liked to use his fist on them." (*Id.* at 217.) She told of one occasion in which the victim was "after" a 14 year-old girl who was waiting for her mother in the tavern. (*Id.* at 223.) Ms. Czybora testified that when she warned him of the trouble he could get into with a 14 year-old he said, "Well, if they bleed, they can get stuck." (*Id.*)

### 2. *Trial Court's rulings*

#### a. *Jackie Carranza*

The State moved to preclude any evidence of alleged violent tendencies of the victim and that he allegedly frequented prostitutes, specifically the testimony of Jackie Dolan–Carranza and Victor Manuel. ("ROA", Doc. No. 52, Part 3, at 4.) [5] The defense argued that this information was relevant to self-defense under Ariz.R. Evid. 404(b) as to Trinidad Lopez's identity, and his state of mind, his intent, and his common plan and scheme to force sex with women he picked up on the streets, including Gina Celaya, after driving them to a secluded desert area near the dump. (*Id.*, Part 3, at 40–45; RT 5/10/94, 26–27.) The trial court granted the State's Motion to Preclude Witnesses Jackie Carranza and Victor Manuel. (*Id.*, Part 9, at 4.) The trial court found Ms. Carranza's testimony was too speculative, and any prejudicial effect would have outweighed any probative value. (*Id.*, Part 9, at 38; Part 48, R.T. 6/10/94, at 2–3, 8.) The trial court made the same finding as to Victor Manuel. (*Id.*, Part 9, at 38.)

#### b. *Teresa Larrivas*

The trial court initially ruled that Ms. Larrivas' testimony was relevant and admissible, (ROA, Part 9, at 37; R.T. 6/10/94, at), but reversed its ruling on admissibility just two days before trial and precluded the testimony on the grounds that Gina Celaya did not know of the acts before the shooting. (ROA, Part 15, at 1.) The trial court granted the State's motion to preclude testimony of Teresa Larrivas, after reviewing the statements provided by Ms. Larrivas, and found that "where self-defense is asserted, as here, then the defen-

---

**5.** ROA refers to the Clerk's Record in the matter of *State v. Celaya*, CR–41554. The State electronically filed the ROA in this Court's Document Numbers 52 and 53, and, because the ROA does not appear to be con-

secutively Bates stamped throughout, the Court will refer to this Court's docket number, part numbers and page numbers for reference to these documents.

dant charged with homicide may be permitted to introduce evidence of specific acts of violence by a deceased *only* when those acts were personally observed by the defendant or made known to him (her) prior to the homicide." (*Id.*, Part 15, at 1–2.) (emphasis in original) (citations omitted). The trial court also held that Ms. Larrivas would not be testifying as to any general character traits of the victim, nor that the unassociated incident eight years ago constituted a "habit". (*Id.*)

### c. *Francis Czybora*

The court precluded Ms. Czybora's testimony because it was unsure she was talking about the same person and because the information was from about 7 or 8 years before Mr. Lopez' death. (RT 9/27/94 at 233–34.)

### 3. *Appeal*

This Court reviews the Arizona Court of Appeals opinion as the last reasoned state court opinion. *See Ylst,* 501 U.S. at 803–04, 111 S.Ct. 2590 (1991). The Arizona Court of Appeals ruled that the trial court properly excluded the testimony of Ms. Carranza and Ms. Larrivas under Rules 404(a)(2) and 405; that character could only be proved by reputation or opinion evidence, and that the trial court did not err by excluding evidence of these two instances of violent behavior. (Answer, Ex. A, at 4.) Further, the court was unpersuaded by the argument that the evidence was not character evidence but proof of a common scheme or plan to assault prostitutes. (*Id.*) The court of appeals also found the trial court properly exercised its discretion under Rule 403 by excluding Ms. Czybora's testimony, offered mid-trial, because the reputation was temporally remote, and the probative value of the evidence was marginal, and would require an expenditure of time to rebut the evidence. (*Id.*) The court of appeals denied a motion to reconsider, and the Arizona Supreme Court denied a petition for review. (Appendix, Ex. B.)

### 4. *Analysis*

Respondents argue that review by this Court is limited to a determination of whether the admission or exclusion of the evidence in question rendered the trial so fundamentally unfair so as to violate the defendant's due process rights, and that this Court has no authority to review error in the trial court's application of Arizona Statutes and the Arizona Rules of Evidence. (Answer, p. 13.)

Respondents are correct in their assertion that a state prisoner is not entitled to relief under 28 U.S.C. § 2254 unless she is held in custody in violation of the Constitution, laws or treaties of the United States. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); 28 U.S.C. § 2254. "Clearly established federal law holds that 'federal habeas corpus relief does not lie for errors of state law,' *Lewis v. Jeffery* [*Jeffers* ], 497 U.S. 764, 780 [110 S.Ct. 3092, 111 L.Ed.2d 606] (1990), and that 'it is not in the province of a federal habeas court to reexamine state-court determinations on state-law questions,' (*Estelle v. McGuire,* 502 U.S. 62, 67 [112 S.Ct. 475, 116 L.Ed.2d 385] (1991))." *See also Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir.1991). A state trial court's admission of evidence under state evidentiary law will form the basis for federal habeas relief only where the evidentiary ruling "so fatally infected the proceedings as to render them fundamentally unfair" in violation of the petitioner's due process rights. *Jammal,* 926 F.2d at 919. This means that a state prisoner challenging the correctness of state evidentiary rulings has alleged no deprivation of federal rights. *Gutierrez v. Griggs,* 695 F.2d 1195, 1197 (9th Cir.1983) (citing *Engle,* 456 U.S. at 118–19, 102 S.Ct. 1558.) Petitioner, however, asserts that the citation to state

evidentiary law is necessary because it is well established that a person exercising the right to present witnesses in her own defense "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." (Reply, at 23) (Citing *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)).

■ "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane*, 476 U.S. at 690, 106 S.Ct. 2142 (internal citations omitted) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). A defendant's right to present a defense stems both from the right to due process provided by the Fourteenth Amendment, *see Chambers*, 410 U.S. at 294, 93 S.Ct. 1038, and from the right "to have compulsory process for obtaining witnesses in his favor" provided by the Sixth Amendment, *see Washington v. Texas*, 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (explaining that the right to compulsory process would be meaningless if the defendant lacked the right to use the witnesses whose presence he compelled).

■ That right, however, is limited. "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038. "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)). Although the Supreme Court has indicated its approval of "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury," *see Holmes v. South Carolina*, 547 U.S. 319, 326, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006), "[i]n these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, [evidentiary rules] may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038. As the Ninth Circuit has explained, "the presence or absence of a state law violation is largely beside the point," the issue is whether the state proceedings satisfy due process. *Jammal*, 926 F.2d at 919–20.

The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). The Supreme Court has "found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308, 118 S.Ct. 1261. On habeas review, the question is whether the court's refusal to admit the evidence rendered Petitioner's trial fundamentally unfair. *Jones v. Schriro*, 2008 WL 4446619 (2008) (citing *Chambers*, 410 U.S. at 302–303, 93 S.Ct. 1038). Petitioner argued to the court of appeals that the "trial court's rulings precluding evidence offered in support of

Gina Celaya's self-defense and crime prevention defense violated her constitutional right to a fair trial, compulsory process, and her right to present a defense to the first-degree murder[ ] charges she faced" and cited relevant Supreme Court case law. Reply, Ex. G, at 3031, 39, 42. The court of appeals, however, did not address Petitioner's constitutional claim. Answer, Ex. B. Accordingly, the claim is reviewed de novo, because in this circumstance "there is no state court decision on [the] issue to which to accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez*, 422 F.3d at 1025–26; *and Nulph*, 333 F.3d at 1056–57.

Petitioner's defense was summarized in her response to the State's motion to preclude impermissible character evidence:

1) [Petitioner] was walking on South Sixth Avenue; 2) the decedent stopped and offered to give her a ride; 3) due to the area of town she was in, the fact it was late at night, she agreed to take a ride; 4) the decedent did not take Gina home as promised, but took her to a wildcat dump in the desert; 5) the decedent asserted that Gina was a prostitute, and upon learning she was not, still insisted on culminating a sex act; 6) the decedent frightened Gina, put her in fear of serious physical injury and fear for her life; 7) Gina fired a gun, not knowing where she had hit the man, and only learned later that he died.

The prosecution's theory of the case was similarly summarized:

a) Gina was walking down Sixth Avenue and passed herself off as a prostitute, and thereby got a ride from the decedent-or-Gina was walking down South Sixth Avenue and was kindly given a ride by the decedent; b) after Gina entered the vehicle she lured the decedent to the wildcat dump in the desert with promise of a sex act-or-she forced the decedent to go to the wildcat dump at the end of a gun; c) upon reaching the wildcat dump Gina shot and killed the decedent so as to take his vehicle (a so-called truck jacking).

Petitioner argued the trial court's preclusion of testimony by the three witnesses deprived the jury of background information about Mr. Lopez—that on two prior occasions the victim drove women he picked up as prostitutes to an isolated desert location where he forcibly sexually attacked them, and that he had a reputation for violence among prostitutes-that might have corroborated Gina Celaya's account of the events immediately preceding the shooting which was critical to her self-defense claim. (Doc. No. 49, Ex. G–Appellant's Opening Brief, at 32.) Petitioner asserted in her appellate brief that the testimony would have corroborated many aspects of her account of the events leading up to the shooting, especially since there were no eyewitnesses to the confrontation in the desert, including: 1) that the victim voluntarily offered her a ride; 2) that through his own initiative, he drove to the isolated desert setting where he was found; 3) that he did so with the intent to engage in sexual relations with her; and 4) that he was sexually assaultive and abusive with her when they arrived. (Doc. No. 49, Ex. G, at 36–38.)

The State argued that evidence of this nature would only have been admissible if Petitioner had known of the decedent's reputation for violence. (ROA, Doc. No. 52, Part 3, at 7–9.) Despite the Petitioner's repeated assertions that the evidence was not being introduced as character evidence under 404(a) and 405, the evidentiary criteria for the introduction of character evidence became the central focus of the State's argument, and the State court's decision to reverse its earlier finding that Ms. Larrivas' testimony was relevant and admissible, and later to affirm that deci-

sion. Little consideration was given to Petitioner's argument that the evidence was presented under 404(b) outside of the appellate court's cursory dismissal of this argument.

Respondents assert that the trial court's exclusion of evidence of the victim's character did not undermine the fundamental fairness of Petitioner's trial because "nothing in the record suggests that Petitioner knew about those alleged past acts, and Petitioner does not contend otherwise." (Answer, at 14.) As Petitioner asserted in her appellate brief, she was not attempting to have specific acts evidence admitted to prove that the victim acted in conformity therewith, she was attempting, under Rule 404(b) to have other act evidence admitted to prove what was perhaps referred to inartfully, as the victims "modus operandi" or as evidence of the victim's design, plan and intent. Under Rule 404(b), while specific act evidence is not admissible to prove the character of a person to show action in conformity with that character, it may be admissible for other purposes "such as proof of motive, opportunity, intent . . ." The list of reasons is not exclusive. *State v. Jeffers,* 135 Ariz. 404, 417, 661 P.2d 1105 (1983).

While adherence to state evidentiary rules suggests that a trial was conducted in a procedurally fair manner, and it is possible to have a fair trial even when state standards are violated, the Ninth Circuit recognizes the converse view-that state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. *Jammal,* 926 F.2d at 919.

The state courts erred by failing to fully consider the admission of specific act evidence under Rule 404(b) (the testimony of Ms. Larrivas and Ms. Carranza) for the purpose of corroborating Petitioner's version of events, and to show the victim's motive and intent to sexually assault Peti-tioner in order to ensure a fundamentally fair trial. The State opened the door to such evidence by attacking Petitioner's credibility and by arguing that Petitioner was a family man who was not intending to sexually assault Petitioner, but was merely giving her a ride home.

The State Courts did not identify or apply clearly established Supreme Court law guaranteeing the right to present a defense. *See Chambers,* 410 U.S. at 302, 93 S.Ct. 1038; *Washington,* 388 U.S. at 19, 87 S.Ct. 1920; *Crane,* 476 U.S. at 683, 106 S.Ct. 2142. The State Courts relied instead on the mechanistic application of evidentiary rules to find that the trial court properly excluded the witnesses.

■ "Even relevant and reliable evidence can be excluded when the state interest is strong," and then "only the exclusion of critical, reliable and highly probative evidence will violate due process." *Perry v. Rushen,* 713 F.2d 1447, 1450, 1452 (9th Cir.1983). As the state interest weakens, less significant evidence is protected. In light of this record, Respondents have identified no state interests that would compel this Court to exclude the evidence at issue.

The trial court's concerns, that it would take time to rebut the evidence and that the evidence was temporally remote, and the appellate court's concern with the reliability of Ms. Czybora's identification, are minor, particularly since the jury heard evidence that the decedent was a decent "grand-fatherly person" and that the prior bad acts of Petitioner were presented through the testimony of Magdalena Laguna and Jessica Vega. Principles of basic fairness and due process require that Petitioner be allowed to present evidence that would corroborate her key theory of the defense, that the decedent had attacked Petitioner before she pulled the gun in self defense. It is in cases like this that a

"collateral issue, such as credibility, may be important and yet nonetheless must sometimes be subordinated to the need of the factfinder to hear relevant evidence." *Arredondo v. Ortiz*, 365 F.3d 778, 788 (9th Cir.2004) (Kozinski, J. concurring).

Additionally, the introduction of the testimony of the three witnesses was not presented in a vacuum. Although the preclusion of three other witnesses is not at issue in this habeas, the facts presented by the pretrial proceedings are relevant to the trial court's decision to preclude the witnesses at issue, and only bolster the relevance and reliability of the proffered testimony. The defense apparently interviewed two sisters, Lois Garcia and Pauline Nassewtewa. They claimed to have known Mr. Lopez from the Hideout bar and told of his violent and abusive acts toward women. (ROA, Part 48, RT 6/10/94, at 11–12.) The trial court noted its intention to preclude these witnesses for the same reasons the court was applying as to Ms. Carranza, (*id.* at 12), but the record seems to indicate that the defense was ultimately unable to produce them for timely interviews or trial, despite a subpoena that is in the record. (ROA, Part 46, RT 6/3/94 at 17; Part 9, at 61–62.)

Similarly, the defense found and interviewed a former prostitute named Tracy Stewart. She stated that Mr. Lopez took her out to a desert area near a dump and had sex with her. Her complaints were that he was too cheap, and took too long to complete the sex act. The transcript of her interview is contained in the Appendix to the original Memorandum filed on November 28, 2001 as Exhibit F. Again, however, the record contains hints that the defense was having trouble locating her before trial (ROA, Part 48, RT 6/10/94 at 14) and she was ultimately not called as a defense witness despite the lack of a formal ruling on the state's motion to preclude her.

A third witness in this category was Victor Manuel. He gave the defense a statement in which he said that Mr. Lopez had aggressively tried to "pick him up" for a "ride home" as he was walking on South Sixth Avenue at night. (Appendix, Ex. G.) Mr. Manuel stated that he declined the offer but Mr. Lopez kept circling back until Mr. Manuel had to hide behind a trash can near a restaurant. (*Id.,* at 4.) The trial court ultimately precluded testimony from Mr. Manuel because he failed to appear for an interview by the State. (RT 6/3/94 at 16.) The defense did not appeal any of the court's rulings regarding Lois Garcia, Pauline Nassewtewa, Jackie Stewart or Victor Manuel.

The testimony of the precluded witnesses at issue in this habeas was both consistent with the testimony of each of the other two witnesses, and, additionally, consistent with the testimony of these four additional witnesses. The exclusion of this relevant and vital testimony was fundamentally unfair, particularly as the strength of testimony is balanced against the State's very minor interests in excluding the testimony.

 The prejudicial impact of any constitutional error is assessed by asking whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (*quoting Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see also Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (holding that the *Brecht* standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

Evaluating the excluded testimony in the context of the entire record, the Court finds that its exclusion had a substantial and injurious effect on the verdict in Peti-

tioner's case. The specific facts Petitioner provided to Detective Thompson about the victim's conduct immediately after the shooting were strikingly similar in many respects to the proffered evidence, which Petitioner did not know about when she made the statements, and would have corroborated her version of events. There was no other witness to the shooting, and the State contested the credibility of the Petitioner's statements, suggesting the accusation of a sexual assault was made up in response to the detective's suggestion. The effect of precluding these witnesses was especially potent in light of the presentation of Petitioner's own prior bad acts through the witness Magdalena "Baby" Laguna, and Jessica Vega. The trial court described the evidence against Petitioner as "overwhelming," consisting of Petitioner's own friends and acquaintances testifying that Petitioner herself told them that she killed the victim in order to steal his truck. The trial court summarized the trial testimony as follows:

> **Sonya Georgina Leyva** (Age 18 on date of trial)—testified that she overheard Gina and Baby Laguna talking about Gina killing a guy. She overheard them say that Gina stole the decedent's truck. (9/22/4 Trial Transcript, p. 49). Gina asked her if she wanted to go to California with them in the truck. (9/24/94 Trial Transcript, p. 35).
>
> **April Ornelas** (age 15 on date of trial)— Gina told her she shot the man at Valencia, near the airport; Gina shot the man in order to get his car; (9/24/94 Trial Transcript, ¶ 78–80). She observed Gina with a gun the day after the shooting loading the gun and handing it to Baby Laguna who fired at pursuers. (9/24/94 Trial Transcript, p. 74).
>
> **Rebecca Antone**—(Age 15 on date of trial)—Gina's good friend. Gina called her numbers of times the day after the murder to tell her "she had a truck" and to invite Rebecca to go "cruising around" town with Gina in the truck. (9/24/94 Trial Transcript, p. 92–92). Gina told Rebecca that she had stolen the truck. (9/24/94 Trial Transcript, p. 95). Gina specifically told Rebecca that she shot the owner of the truck on Valencia by the airport. This conversation occurred in Rebecca Antone's room in the presence of the other girls. (9/24/94 Trial Transcript, p. 96). She testified that she saw Gina carrying a gun that day in a blue pouch (9/24/94 Trial Transcript, p. 98).
>
> **Gloria Espinosa**—(age 16 on date of trial)—Gina and Baby pull up in the truck next to Gloria and April while they're walking. Gina invites them to go cruising in the truck. They were planning on going to California. (9/24/94 Trial Transcript, ¶. 113–114). She saw Gina with the gun. (9/24/94 Trial Transcript, ¶. 117–119). She testified as follows:
>
> "Well, when we got to Rebecca's house and we had crashed, April had asked Gina where she got the truck from, and Gina told her that she killed Trinidad and got the truck from him." (9/24/94 Trial Transcript, p. 119 Lines 6–9). Gina said she killed the man because she wanted the truck. (9/24/94 Trial Transcript, p. 120).
>
> **Baby Laguna**—(age 16 on date of trial)—She testified that she and Gina had previously stolen a car and gone to California. (9/24/94 Trial Transcript, ¶. 253–254). Just prior to the murder, she testified that Gina came to her home with a gun, asked Baby to help her unstick the gun, and asked Baby to go with her because she wanted to get a car. (9/24/94 Trial Transcript, ¶. 255–259). Baby told Gina she was sick and could not go with Gina. Baby's mother told Gina to leave. (9/24/94 Trial Transcript, p. 259). The next day, Gina showed up at Baby's house with the

truck. (9/24/94 Trial Transcript, p. 262). When she asked Gina whose truck it was, Gina told her she shot some guy. (9/24/94 Trial Transcript, p. 264). She testified that Gina told her that she pretended that she was a prostitute and the guy picked her up and they went over by the desert. She testified that they were outside in the desert when she shot the man. She testified that Gina drove by the area where she had shot the man to show Baby. (9/24/94 Trial Transcript, ¶. 267–271). Gina told Baby that she got nineteen dollars from the man. She said the man begged her not to kill him. (9/24/94 Trial Transcript, ¶. 271–273). They were planning to drive the truck to California or Bisbee. (9/24/94 Trial Transcript, ¶. 19–20). While the above mentioned girls and Gina were at Rebecca's house, Gina stole the three girls and Baby "that she had shot some man, and that they had better not say nothing." She told them the man she shot was the owner of the truck. She saw Gina with the handgun in the blue bank bag. (9/24/94 Trial Transcript, ¶. 26–28).

. . .

. . . With regard to her cross-examination of Baby Laguna, [defense counsel] impeached Ms. Laguna with regard to her immunity, the fact that she had committed numbers of crimes for which she was not being prosecuted, that she had imagined and made up her testimony in order to avoid getting into trouble, and impeached her with numerous prior inconsistent statements.

Exhibits to Second Amended Memorandum of Points and Authorities to Petition for Writ of Habeas Corpus, Ex. 8, Minute Entry, October 24, 2003, p. 16–17. [6]

Without the testimony of the three witnesses, there was very little reason for the jury to believe Petitioner's version of events. The testimony of those witnesses would have drastically altered the juries perception of what happened the night Mr. Lopez was shot. There is no question that Petitioner admitted she shot the victim and took his truck. If Petitioner had presented testimony that corroborated her version of events, there is a strong chance the jury may have chosen to believe that while what happened before and after the events which occurred in the desert may have been an exercise in extremely poor judgment as well as a complete disregard for human life by Petitioner, that Petitioner's friends were lying, or Petitioner was lying when she told her friends how she obtained the truck.

The State Court's denial of relief for the violations of Due Process, Compulsory Process, the right to present evidence and the right to a fair trial rendered Petitioner's trial fundamentally unfair and was contrary to clearly established law and had substantial and injurious effect or influence in determining the jury's verdict. Accordingly, the Magistrate Judge recommends that the District Court grant relief as to Ground One of the Petition.

### C. *Ground Two*

Petitioner argues that the trial court's refusal to admit Petitioner's tape recorded statement after the State used it to impeach her was contrary to clearly established federal law and violated her consti-

---

**6.** Transcripts of the trial in its entirety were not submitted to this Court with the ROA. This characterization of trial testimony is obtained from the trial court's minute entry denying Petitioner's First Rule 32 Petition. (Doc. No. 37, Ex. 8.). Having failed to submit complete transcripts along with their support-ing memorandum, either party may file objections to this Court's factual summarization of the testimony, along with supporting documentation, to be included in the objection or response filed to this Report and Recommendation.

tutional right to due process of law, fair trial, and to present a defense, as she was entitled to introduce this evidence under Ariz. R.Evid. 106.

### 1. Relevant facts

The relevant facts are taken from Petitioner's memorandum, and are essentially uncontested:

Tucson Police Detective Thomson interrogated Gina Celaya following her arrest at 4 a.m. on the morning of the day after the shooting. He obtained two brief tape-recorded statements. (RT 9/14/94 at 5–41; State's Exhibits 163 and 164 copies of which are included as Exhibits L (24 pages) and M (5 pages) in the Appendix to the original Memorandum filed on November 28, 2001.) Gina Celaya was unaccompanied by an adult or an attorney when she gave those statements. (ROA, Part 54, RT 9/14/94 at 14.) At first Gina denied knowledge of the shooting but after the detective asked her whether the man had tried to harm her, and told her that this was her chance to say so, she admitted that she had shot him after he attempted to sexually assault her. (Appendix, Ex. L at 1–10.)

Before trial, the State obtained an order prohibiting the defense from introducing the taped statements, which it characterized as self-serving hearsay. The State stipulated that it would not introduce evidence of Gina Celaya's statements during its case-in-chief. Although the prosecution did not introduce Gina Celaya's statements to Detective Thomson in its case-in-chief, during cross-examination the prosecutor extensively used portions of the taped statements to impeach Gina's direct testimony. (ROA, Part 63, RT 9/27/94 at 169–189.) The usage of the taped statements was wide-ranging and covered many topics including the following: the actions Miss Celaya took when she reached the desert (id. at 169–171); whether she told Detective Thomson that she shot the man because he laughed at her (id. at 172); whether she took the safety off the gun before shooting (id. at 171); whether Trinidad Lopez was coming at her when she shot him (id. at 173); whether Detective Thomson was the first person she told that Trinidad Lopez had tried to hurt her (id. at 175, 179); whether Miss Celaya denied taking the truck during the initial portion of the statement (id. at 180); what she told Detective Thomson about who owned the gun (id. at 185); whether Detective Thomson told her that Baby said the man thought she was a prostitute (id. at 189); and whether it was Gina's or the detective's decision to talk off-tape. (id. at 189) These questions covered the crucial area of the events preceding and during the shooting. The prosecutor's questions were culled from every portion of Miss Celaya's tape-recorded statements.

The cross-examination use of the tapes covered the issue of the origin of the self-defense claim and whether Detective Thomson planted the idea of self-defense in Gina's mind which she then fabricated.

Q. Okay. Now, when Detective Thomson said to you on Page 10 of your statement—you want to make sure that you remember what your answer was now-Detective Thomson said—asking you if you killed him in self—defense, and later on do you remember what you told him at that point?

A. Yeah.

Q. What did you tell him?

A. I told him what he tried to do.

Q. No, that's not true. Read what it says there, your very first answer.

A. Where I said I didn't kill nobody?

Q. You told him you didn't kill nobody?

A. Yeah.

Q. Later on in the court: "Judge, I shot him because he tried to hurt

me." I am giving you that opportunity right now. What did you say? "Did this man hurt you." And what did you say?

A. Yeah.

Q. Right. And that's the first time that you ever mention to anyone that this man tried to hurt you in any way?

A. That's the first time, yes.

*Id.,* RT 9/27/94, 183–184.

On redirect examination, defense counsel read a brief portion of one of Gina's answers during the interrogation into evidence, and elicited Gina's testimony that she had told Detective Thomson about the details of what had occurred in the desert and on the drive out. (*Id.,* RT 9/27/94 at 190–195). Then, near the close of the defense case, the defense moved to play portions of the tape-recorded statements for the jury in order to place Gina's statements in context following the impeachment that occurred during cross-examination. (RT 9/28/94, 35.)[7] Defense counsel argued:

> What happened in cross-examination after Ms. Celaya testified, the State asked her a whole series of questions taken from one page and another page, and attempted to impeach her, without the jury able to hear the context in which they were played. And I think that in the interest of fairness, I should be allowed to play a portion of the tape.

*Id.* at 35–36 (emphasis added).

The prosecution objected on hearsay grounds to playing the tape. The trial court denied without explanation the motion to play the tape of pages 10–24 of Ms. Celaya's initial statement and ruled that the portion of the second statement would not be admitted because the witness had been "adequately rehabilitated." (RT 9/28/94, 39–40.)

During rebuttal closing argument, the prosecutor argued, over defense objection, that defense counsel could have put in the evidence of the statements if she had wanted the jury to hear them. (RT 9/28/94,160.) The prosecutor argued to the jury that Miss Celaya could have testified about "everything else" she said, or that the defense could have called Detective Thomson to introduce the statements. (RT 9/28/94, 160.) The court overruled defense objections. *Id.* The prosecutor argued to the jury that she was "not obligated to put on the defendant's lies." *Id.*

### 2. Appeal

The Court of Appeals affirmed the trial court's decision to not allow defense counsel to play sections of defendant's taped statements to the jury. (Appendix, Ex. B.) The appellate court found Rule 106 of the Arizona Rules of Evidence inapplicable in that context. Rule 106 provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

The Court of Appeals found that, by its terms, the rule applies only when proof is made through introduction of a statement, and not through impeachment through prior inconsistent statements. (Appendix, Ex. B., at 2–3.) In the context of impeachment, the court found that the risk of misleading the trier is avoided by the abili-

---

7. Again, this portion of the trial transcript is missing from the ROA. This characterization of trial testimony is obtained from Petitioner's Second Amended Memorandum of Points and Authorities to Petition for Writ of Habeas Corpus (Doc. No. 31.). Objections to this characterization of the record due to failure to submit trial transcripts may be raised in objections to this Report and Recommendation.

ty of the witness to correct misperceptions by present testimony, rather than past hearsay; and that this was in fact what defense counsel did on redirect. (*Id.*, at 3.)

The appellate court found that, as to Petitioner's second argument, that the prosecutor engaged in misconduct in saying that the defense could have introduced defendant's prior statements, the state was responding, improperly, to defense counsel's arguments that the jury could infer from the failure of the state to introduce defendant's pretrial statements that they were adverse to the state. The appellate court found that the state's improper response to the improper arguments was harmless because it "at best neutralized an impermissible inference sought to be exploited by the defense." (*Id.*)

### 3. Analysis

This court will not review the court of appeals' determination that the rule of completeness was inapplicable in this situation, since that is a question of Arizona evidence law. Instead, this court must again determine if the evidentiary ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. The relevant Supreme Court precedents are those discussed above. An evidentiary ruling would be unconstitutional if it "so infused the trial with unfairness as to deny due process of law." *Estelle*, 502 U.S. at 75, 112 S.Ct. 475. Moreover, such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes [the rule is] designed to serve." *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

The Arizona Court of Appeals considered the application and purpose of the rule and explained:

The rule exists to prevent misleading the trier by introducing only a portion of a statement when other parts of the statement indicate that the portion sought to be introduced distorts the meaning intended. By its terms it applies only when proof is made through introduction of a statement. It ought not apply to impeachment through prior inconsistent statements. The risk of misleading the trier is avoided by the ability of the witness to explain her prior statements, why she made them, and what she meant. Distortion, in short, is prevented by the opportunity to correct misperceptions by present testimony rather than past hearsay.... "In fairness" therefore, the consistencies need not be considered contemporaneously with the inconsistencies.

(Appendix, Ex. B.)

Petitioner asserts that, during rebuttal closing argument the prosecutor "made matters even worse," misleading the jury by arguing that defense counsel could have put in the evidence of the statements if she had wanted the jury to hear them. The court overruled defense objections. The appellate court considered the argument that the prosecutor engaged in misconduct, while initially plausible, ultimately unavailing because of the context in which the statement was made. (*Id.*)

Although the Petitioner cites several Supreme Court cases in her Petition, it cannot be said, under the AEDPA, that there is "clearly established" Supreme Court precedent addressing the issue before this Court. This Court has found no case wherein the Supreme Court addressed the constitutionality of the "rule of completeness" nor has the Supreme Court extended the protections of the Due Process Clause, the Compulsory Process Clause or the Confrontation clause to a trial court's exclusion of a defendant's otherwise inadmis-

sible statement to rehabilitate a defendant after impeachment.

In an analogous case however, the Supreme Court held that "an essential component of procedural fairness is an opportunity to be heard." *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). In *Crane*, the Supreme Court found that the Kentucky courts erred in foreclosing petitioner's efforts to introduce testimony about the environment in which the police secured his confession. *Id.* at 691, 106 S.Ct. 2142. The Court opined that evidence about the manner in which a confession was obtained is often highly relevant to its reliability and credibility and that such evidence was especially relevant in the rather peculiar circumstances of this case, in which the Petitioner sought to paint a picture of a young, uneducated boy who was kept against his will in a small, windowless room for a protracted period of time until he confessed to every unsolved crime in the county, including the one for which he stood convicted. *Id.* The Court reversed the conviction, holding that the introduction of evidence of the physical circumstances that yielded the confession was "all but indispensable to any chance of its succeeding" especially since neither the state court nor the respondents had advanced any rational justification for the wholesale exclusion of this body of potentially exculpatory evidence. *Id.*

Although this Court cannot extend the specific legal principal announced in *Crane* to the facts of this case, this Court finds that the circumstances of the trial court's mechanistic application of Rule 106 to exclude Petitioner's statements, presented out of context by the State, although damaging to Petitioner's case, would not, for reasons cited by the appellate court, rise to the level of the *Brecht* "substantial and injurious" standard. *See* 507 U.S. at 637, 113 S.Ct. 1710.

Upon review of the record in this case, the Magistrate Judge finds that the ruling was not contrary to nor an unreasonable application of clearly established federal law as announced by the United States Supreme Court. Accordingly, the Magistrate Judge recommends that the District Court deny relief as to Ground Two of the Petition.

### D. *Ground Three*

Petitioner raises nine claims of ineffective assistance of trail counsel pursuant to the sixth and Fourteenth Amendments to the United States Constitution as determined by the United States Supreme Court. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Respondents assert that these claims are barred from federal habeas review because the state court found them precluded under state law.

#### 1. *Relevant facts*

On February 20, 2002, Petitioner filed her second petition for post-conviction relief, raising claims of ineffective assistance of counsel and one claim, in the alternative, of a change in the law. (Second Amended Petition, Supp. Ex. 1.) On October 24, 2003, the trial court denied the petition with regard to all assertions of ineffective assistance of trial counsel, finding the claims precluded. (*Id.*, Supp. Ex. 8, at 13.)

#### 2. *Appeal*

In a memorandum decision filed August 22, 2006, the court of appeals granted review, but denied relief. (*Id.*, Supp. Ex. 14.) The court of appeals held that "the decision by [Petitioner's] first Rule 32 counsel not to assert any claims of ineffective assistance of trial counsel in that proceeding constituted a waiver of those claims in subsequent proceedings and that [Petitioner's] personal knowledge and in-

formed consent were not necessary to effect the waiver." (*Id.*) The appellate court explicitly found that the acts and omissions by trial counsel that Petitioner was raising as an IAC claim did not involve or affect any such basic or personal rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial that would require a knowing, voluntary and intelligent waiver. (*Id.*)

Petitioner filed a petition for review of the appellate court's decision with the Arizona Supreme Court, urging the supreme court to find that the claims were not precluded unless they were knowingly, intelligently and voluntarily waived. (*Id.*, Supp. Ex. 15, at 7) The supreme court denied review on June 5, 2007. (*Id.*, Supp Ex. 16.)

### 3. *Analysis*

■ If a state court expressly applied a procedural bar when a petitioner attempted to raise the claim in state court, and that state procedural bar is both "independent" and "adequate"—review of the merits of the claim by a federal habeas court is barred. *See Ylst*, 501 U.S. at 801, 111 S.Ct. 2590 ("When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court.") (*citing Wainwright v. Sykes*, 433 U.S. 72, 87–88, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) and *Murray v. Carrier*, 477 U.S. 478, 485–492, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). A state procedural default rule is "independent" if it does not depend upon a federal constitutional ruling on the merits. *See Stewart v. Smith*, 536 U.S. 856, 860, 122 S.Ct. 2578, 153 L.Ed.2d 762 (2002). A state procedural default rule is "adequate" if it is "strictly or regularly followed." *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (quoting *Hathorn v. Lovorn*, 457 U.S. 255, 262–63, 102 S.Ct. 2421, 72 L.Ed.2d 824 (1982))

■ Moreover, if a state court applies a procedural bar, but goes on to alternatively address the merits of the federal claim, the claim is still barred from federal review. *See Harris v. Reed*, 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.... In this way, a state court may reach a federal question *without sacrificing its interests in finality, federalism, and comity.*") (*citations omitted*); *Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir.2003) ("A state court's application of a procedural rule is not undermined where, as here, the state court simultaneously rejects the merits of the claim.") (*citing Harris*, 489 U.S. at 264 n. 10, 109 S.Ct. 1038).

Petitioner asserts that the IAC claim is not procedurally barred in this Court because the preclusion rule was unclear at the time it was supposedly broken. (Petition, at 31.) Petitioner asserts that the relevant time frame for consideration is the period when first-PCR counsel supposedly "broke" the rule-somewhere between November of 1994 and August of 1998.

The rule of preclusion by waiver for ineffective assistance of counsel claims not raised in previous Rule 32 proceedings existed both prior to and during the relevant time period at issue. In *State v. Conner*, 163 Ariz. 97, 786 P.2d 948 (1990), in a second post-conviction relief proceeding, the defendant raised, for the first time, ineffective assistance of counsel at trial. *Id.* at 99–100, 786 P.2d 948. The Arizona Supreme Court held that the issue was waived and the defendant was precluded from raising it. *Id.* at 100, 786 P.2d 948;

*see also State v. Pac,* 175 Ariz. 189, 190–91, 854 P.2d 1175, 1176–77 (Ariz.App.1993) (finding issues waived because they could have been raised in a prior post-conviction relief proceeding or on direct appeal). In 1995, the Arizona Supreme Court referred to this as "the usual rule[ ] of preclusion." *Krone v. Hotham* 181 Ariz. 364, 366, 890 P.2d 1149 (1995).

Rule 32.2(a) of the Arizona Rules of Criminal Procedure constitutes an independent state law ground, *see Stewart,* 536 U.S. at 860, 122 S.Ct. 2578, and the Ninth Circuit has repeatedly determined that Arizona regularly and consistently applies its preclusion rules such that they are an adequate bar to federal review of a claim. *See Ortiz v. Stewart,* 149 F.3d 923, 932 (9th Cir.1998) (finding Rule 32.2(a)(3) regularly followed and adequate); *Poland v. Stewart,* 117 F.3d 1094, 1106 (9th Cir.1997) (same).

Petitioner asserts that, had the rule been clear, the United States Supreme Court would not have had to certify a question to the Arizona Supreme Court asking how the rule worked, as it did in *Stewart v. Smith,* 534 U.S. 157, 122 S.Ct. 1143, 151 L.Ed.2d 592 (2001). The certified question posed to the Arizona Supreme Court, however, asked how the rule worked at the time the state court had ruled on respondent's claim—*in 1995*—three years before the relevant date in this case. *See Stewart v. Smith,* 534 U.S. 157, 122 S.Ct. 1143, 151 L.Ed.2d 592 (2001).

Petitioner concludes by stating that the comment to Rule 32.2(a), as it was updated in 1996, "told practitioners (both judges and lawyers) that if trial errors were 'egregious' enough they would not be precluded in successive PCR proceedings. The resultant confusion interfered with a fair opportunity to seek relief on such claims in state court." *See* Petition, p. 36. This conclusion errs in both law and fact.

First, the comment to Rule 32.2 updated in 1996 reads in relevant part:

"[t]he pre–1992 version of Rule 32.2(a)(3) indicated that a defendant must knowingly, voluntarily and intelligently" not raise an issue at trial, on appeal, or in a previous collateral proceeding before the issue was precluded. [citation omitted] While that is the correct standard of waiver for some constitutional rights, it is not the correct standard for other trial errors. Accordingly, some issues not raised at trial, on appeal, or in a previous collateral proceeding may be deemed waived without considering the defendant's personal knowledge, unless such knowledge is specifically required to waive the constitutional right involved. If an asserted claim is of sufficient constitutional magnitude, the state must show that the defendant "knowingly, voluntarily and intelligently" waived the claim. For most claims of trial error, the state may simply show that the defendant did not raise the error at trial, on appeal, or in a previous collateral proceeding, and that would be sufficient to show that the defendant has waived the claim.

This comment to the Rule put attorneys on notice, even prior to *Smith,* that the "knowing, voluntary and intelligent" standard of waiver was not the correct standard for all trial errors. A review of State law as cited above indicates that courts had been applying a preclusion by waiver through a failure to raise the claim in a prior petition standard for ineffective assistance of counsel claims, and there is no reason to believe that this rule or comment did anything more than reinforce the notion that if you failed to raise an issue that was not "of sufficient constitutional magnitude" then the issue would be deemed waived without consideration of the defendant's personal knowledge.

Factually, it is not accurate to say that any "resultant confusion" caused by the commentary interfered with Petitioner's opportunity to seek relief on such claims in state court. Petitioner's counsel who represented her in her first PCR testified that she chose not to raise issues of ineffectiveness because of their limited success (Supplemental Ex. 7, at 135) and/or because she did not spot any of the ineffective assistance of counsel claims raised in the second PCR. (Supplemental Ex. 7, at 137–139). Petitioner's counsel discussed with Petitioner that she would not be raising any ineffective assistance of counsel claims, but acknowledged that had counsel been aware of the facts that were developed at the second PCR hearing, she would have filed a Rule 32. (Ex. 7, at 138–140.)

Finally, Petitioner urges this Court to consider that Ariz.R.Crim.P. 32.4(c) required the appointment of counsel for a first IAC claim in a second PCR case until the rule was changed in the year 2000. The rule stated:

> Upon the filing of a timely notice in a capital case, or the first notice in a non-capital case, or the second or subsequent notice in a non-capital case, which, for the first time, raises a claim of ineffective assistance of counsel, the presiding judge shall appoint counsel for the defendant within 15 days if requested ...

It does not necessarily follow from the pre–2000 version of Rule 32.4 that Arizona law contemplated that IAC claims involving egregious trial error could be raised in a second PCR case. A second or subsequent notice invoking ineffective assistance of counsel may, or may not have been raising claims of trial error, for instance, the second PCR may raise IAC claims as to appellate counsel or as an exception to the preclusionary rule which would allow a notice of post conviction relief of right or

notice of appeal outside of the limitations period to be filed under Rule 32.2(b).

The court in *Smith* recognized what was required of a defendant, at the time Petitioner filed her claim, to avoid preclusion of a claim of ineffective assistance of counsel: she must show a constitutional right is implicated, one that can only be waived by a defendant personally. 202 Ariz. 446, 46 P.3d 1067. The court noted some of the relatively few rights that can be so characterized. *Id.*, citing *State v. Moody*, 192 Ariz. 505, ¶ 22, 968 P.2d 578 (1998) (waiver of right to counsel); *State v. Butrick*, 113 Ariz. 563, 566, 558 P.2d 908 (1976) (waiver of right to jury trial); *State v. Smith*, 197 Ariz. 333, ¶ 17, 4 P.3d 388 (Ariz.App.1999) (right to twelve-person jury); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 237, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("Almost without exception, the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial."); *cf. State v. Lee*, 142 Ariz. 210, 215, 689 P.2d 153, 158 (1984) (although "certain basic decisions have come to belong to an accused," such as "[t]he ultimate decisions on whether to plead guilty, whether to waive jury trial, and whether to testify," "the power to decide questions of trial strategy and tactics," including what witnesses to call at trial, "rests with counsel"). An alleged violation of the general due process right of every defendant to a fair trial, without more, does not save such claim from preclusion.

Accordingly, the Magistrate Judge finds that the State court's preclusionary ruling is an independent and adequate procedural bar. Because the procedural bar is adequate and independent, federal review of this claim is foreclosed unless Petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice. The Magistrate Judge finds no cause to excuse

the procedural default. There was no objective factor external to the defense which impeded Petitioner's efforts to comply with the State's procedural rule, Petitioner merely failed to raise the issues in her first Rule 32. Federal review of this claim is barred.

## IV. RECOMMENDATION

This Court recommends that the District Court **DISMISS** claims Two and Three of Petitioner's Second Amended Petition for Writ of Habeas Corpus.

This Court further recommends that the District Court **GRANT** Petitioner's request for relief as to Ground One, and remand this case to the state court for a new trial.

Pursuant to 28 U.S.C. § 636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. A party may respond to another party's objections within ten days after being served with a copy thereof. Fed.R.Civ.P. 72(b). If objections are filed the parties should use the following case number: **CIV 01–0622–TUC–DCB.**

DATED this 26th day of August, 2009.